the plaintiff.  *See Tools USA & Equip.*, 87 F.3d at 658. Unlike the Fourth Circuit's review of the record in *Tools USA & Equipment*, visual inspection of the two catalog designs in this case "lead[s] to the inescapable conclusion," *id.* at 660, that the respective trade dresses are not similar.

When the trade dresses are so "clearly distinguishable and would appear so to all but the most obtuse consumer," *Haagen-Dazs*, 493 F. Supp. at 75, that a court may resolve the issue of the dresses' similarity as a matter of law, the defendant's resounding success on this factor makes the plaintiff's burden of prevailing on the seven other *Frisch's* factors effectively insurmountable.   A strong visual impression of dissimilarity ordinarily "receives great weight in determining the likelihood of confusion." *TrafFix*, 200 F.3d at 934 (citing *Kangol, Ltd. v. Kangaroos U.S.A., Inc.*, 974 F.2d 161, 163 (Fed. Cir. 1992)), *rev'd on other grounds*, 121 S. Ct. 1255.  Moreover, "[w]hat is important is not whether people will necessarily confuse the marks, but whether the marks will be likely to confuse people into believing that the goods . . . emanate from the same source." *Kangol*, 974 F.2d at 163.  There is so little danger of a consumer picking up the two catalogs and not quickly realizing that they emanate from different sources that judgment as a matter of law for American Eagle is appropriate.

### IV

For the foregoing reasons, we conclude that Abercrombie's clothing designs and in-store presentations are legally functional non-protectable trade dress and that Abercrombie could not possibly have carried its burden of proving that American's catalog was confusingly similar to what we have presumed is the protectable trade dress of Abercrombie's Quarterly.  On this basis, we **AFFIRM** the judgment of the district court in favor of defendant American Eagle Outfitters, Inc.

*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2002 FED App. 0060P (6th Cir.)
File Name:  02a0060p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

—————————————

| | |
|---|---|
| ABERCROMBIE & FITCH STORES, INC.,<br>    *Plaintiff-Appellant,*<br><br>v.<br><br>AMERICAN EAGLE OUTFITTERS, INC.,<br>    *Defendant-Appellee.* | No. 99-4240 |

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 98-00569—John D. Holschuh, District Judge.

Argued:  December 7, 2000

Decided and Filed:  February 15, 2002

Before:  JONES, BOGGS, and SILER, Circuit Judges.

—————————————

### COUNSEL

**ARGUED:**  Frank J. Colucci, COLUCCI & UMANS, New York, New York, for Appellant. Robert G. Sugarman, WEIL, GOTSHAL & MANGES, New York, New York, for Appellee.  **ON BRIEF:**  Frank J. Colucci, COLUCCI & UMANS, New York, New York, Melvin D. Weinstein,

KEGLER, BROWN, HILL & RITTER, Columbus, Ohio, for Appellant.  Robert G. Sugarman, Lynda M. Braun, WEIL, GOTSHAL & MANGES, New York, New York, for Appellee.

––––––––––––––––––

**OPINION**

––––––––––––––––––

BOGGS, Circuit Judge.  This case pits an old hand at trademark law against the new kid on the block: Abercrombie & Fitch sued American Eagle Outfitters to stop American Eagle from infringing what A&F describes as its unregistered "trade dress," made protectable by Section 43(a) of the Lanham Act.  A&F claimed that AE impermissibly copied the designs of certain articles of clothing, in-store advertising displays, and a catalog.  The district court granted summary judgment in favor of American Eagle, reasoning that Abercrombie & Fitch had sought protection for something that did not constitute trade dress at all.  Abercrombie timely appealed.  Today "we relieve A&F of some of its unhappiness but not of all." *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 7 (2d Cir. 1976).  We affirm the judgment of the district court, albeit for different reasons: the clothing designs A&F seeks a monopoly on are functional as a matter of law, and therefore not protectable as trade dress; the A&F Quarterly constitutes non-functional distinctive trade dress, but the American Eagle catalog is not confusingly similar to it, as a matter of law.

**I**

Abercrombie & Fitch Stores, Inc. ("Abercrombie" or "A&F") describes itself as a "retailer of men's and women's casual clothing, such as t-shirts, outerwear, sweatshirts, woven shirts, sweaters, jeans, khakis, shorts, baseball caps, belts, socks, and other accessories . . . designed primarily to appeal to young men and women of college age."  It sells its products nationwide through 157 retail stores and a mail-

other media), are nevertheless often radically different, *compare* JA at 352 (AE on "After all the gifts are opened . . . and the decorations are packed away, there is really one thing that lasts through the holidays . . . the spirit of giving") *with* JA at 375, 411, 786, 834 (A&F on "Must have mongrels," "Nothing beats a good truck,""I'll have a brew Christmas," "7 ways to survive a holiday gathering with your relatives"); *see also* JA at 146 (Carl Quintanilla, *Du-ude! Clothier's Catalog Sells Students on Drinking*, THE WALL STREET JOURNAL (July 24, 1998) (covering a Quarterly feature called "Drinking 101," which included recipes and a device for playing drinking games, and the uproar it generated with, among others, Mothers Against Drunk Driving)).  Most notably, Abercrombie displays its trademarks and variations of them throughout the Quarterly.  On nearly every page of the Quarterly in the record, the Abercrombie name and marks are visible.  The American catalog does not shy away from the American marks; they also appear throughout.  While both companies liberally using their trademarks throughout their catalogs is a similarity, it is also a difference, because each uses *its own* trademark and trademarks are designedly an indication of a product's origin.

On these undisputed facts, we conclude that the trade dress of American's catalog is, as a matter of law, not similar to the A&F Quarterly in terms of the overall visual impression the two catalogs create.  No rational trier of fact could conclude that the overall appearances created by the configuration of the two catalogs are similar.  They contain too many significant dissimilarities, in terms of both style, layout, and content, along with the ubiquitousness of the producers' respective trademarks constantly indicating— on practically every page— the catalog's origin, to conclude otherwise.  This case is wholly unlike *Tools USA & Equipment*, where the defendant reproduced a "stars and stripes" logo around the catalog name, an ordering information box and the phrase "Attention: Body Shop Managers" in capital letters at the bottom of the cover page, and a banner containing ordering instructions across each page, among other devices used by

logos displayed more or less prominently.  A&F works with noted fashion photographer Bruce Weber, whose style is well-known in the industry and recognizable by even the uninitiated.[24]  American's photographs in contrast, present a decidedly wholesome image, with people of various ages in non-suggestive, often family-oriented situations; nudity is absent.  The pictures themselves are much less grainy than Abercrombie's, and there are far fewer of them.  Totally absent from American's catalog is the sort of campy sketchwork that dominates much of A&F's editorial content.  *See* JA at 437 (depicting "skinny snowboarding" and "nude water polo").  American makes sparing use of lifestyle editorial content, and the subjects, while occasionally similar, *compare* JA at 340-41 (AE's mention of a few books and magazines) *with* JA at 383-84 (A&F reviewing books and

---

[24]In the world of fashion, as in the world of technology, it appears that the judicial system may be ill-equipped to keep pace with rapidly evolving trends and innovations.  *See United States v. Microsoft Corp.*, 253 F.3d 34, 48-49 (D.C. Cir. 2001) (noting the "enormous practical difficulties for courts considering the appropriate measure of relief in equitable enforcement actions [involving the computer software industry], both in crafting injunctive remedies in the first instance and reviewing those remedies in the second).  The record in this case contains A&F Quarterlies more than four years old.  Fashion trends have come and gone in that span of time.  Recent non-record evidence indicates that A&F's Quarterly, too, has undergone some changes over the years.  A&F early captured headlines for the bacchanalian content of its catalog, *see infra* pages 42-43.  According to widespread reports in the popular media, it did so again with its Spring Break 2001 issue, called "XXX," which A&F stores sold under wraps only to those over age 18 because it contains more bare skin than ever.  *See* Marta Murvosh, *Clothier Deems its Hit Catalog Too Sexy for Utah*, SALT LAKE TRIB., Apr. 12, 2001, at A1 (reporting on A&F's decision not to sell the Spring Break issue in Utah "because of the company's interpretation of a 'soft porn law' that bans displays of publications with sexually charged nudity at stores frequented by people under age 18").  Still, such changes are consistent with our determination that, as a matter of law, American Eagle's catalog is not confusingly similar to the Quarterly's unmistakable image.  Although A&F now proudly displays models wearing no clothing at all, the "overall image" of the Quarterly and its connection to the Abercrombie brand apparently remains unchanged.

order catalog under the registered trademarks and service marks ABERCROMBIE & FITCH, A & F CO, A & F, and variations thereof.  Founded in 1892, Abercrombie was acquired by The Limited, Inc., in 1988.  Since then, it has enjoyed a remarkable rejuvenation of its brand, selling in excess of $1.4 billion in merchandise (through June 1998) and expending more than $26 million on marketing its brand, including advertisements in national and fashion magazines.

A&F identifies an "Abercrombie brand" as having "unique and inherently distinctive features" and refers to such as its trade dress.  This trade dress, Abercrombie claims, comprises nine features:

1) Use of the Abercrombie marks, in particular the A & F trademark in Universe Bold Condensed typeface.

2) Use of the word *performance* on labels and advertising and promotional material to convey the image of an active line of casual clothing.

3) Use of such words and phrases as *authentic*, *genuine brand*, *trademark*, and *since 1892* on labels and advertising and promotional material to convey the reliability of the Abercrombie brand.

4) Use of the word *outdoor* on labels and advertising and promotional materials to convey the image of a rugged outdoor line of casual clothing.

5) Use of design logos, such as the ski patrol cross and lacrosse sticks, and product names for the types of clothing, such as "field jersey," to convey the image of an athletic line of casual clothing.

6) Use of primary color combinations, such as red, blue, grey, tan, and green in connection with solid, plaid, and stripe designs, to create a consistent design and color palette.

7) Use of all natural cotton, wool, and twill fabrics to create a consistent texture palette.

8) The creation of a cutting edge "cool" image through photographs and advertising and promotional material, such as the A&F Quarterly (the "catalog" or "Quarterly"). The Quarterly presents the Abercrombie brand and trade dress in a unique manner: namely, it features the Abercrombie brand and trade dress in a "cutout" or "clothesline" style and uses color bars to illustrate the available colors of the item, while combining a consistent conceptual theme with a lifestyle editorial content of music, electronics, books, and magazine features. The catalog is printed on cougar vellum paper, which is unique for a catalog.

9) The creation of a consistent merchandise look in A&F stores through the use of in-store signage and display setups and through the use of the "Abercrombie sales associate team," which is comprised primarily of college students. *See* Compl. ¶ 7.

American Eagle Outfitters, Inc. ("American Eagle" or "American"), sells essentially the same variety of clothing and products in its 300 stores nationwide, under the trademarks and service marks AMERICAN EAGLE OUTFITTERS and AE, and generates approximately $300 million in annual sales. American has been a retailer since at least 1994, although many of its products describe the company's vintage as 1977. Abercrombie accuses American of capitalizing on the former's success in the market by selling confusingly similar products and marketing them in a way confusingly similar to Abercrombie's image. A&F asserts that its premiere issue of the Quarterly, the Fall 1997 issue, was copied by American Eagle, whose own catalog featured the same products (such as shirts, jeans, sweatshirts, boxer shorts, sweater vests, jackets, and pajamas), containing the same colors, having the same designs, being made from the same fabrics, and bearing the same product names (*e.g.*, "vintage" sweatshirts and "field jerseys"). A&F also claims that the

The Sixth Circuit has identified eight factors as informing the likelihood of confusion inquiry: 1) strength of the plaintiff's mark, 2) relatedness of the goods, 3) similarity of the marks, 4) evidence of actual confusion, 5) marketing channels used, 6) likely degree of purchaser care, 7) defendant's intent in selecting the mark, and 8) likelihood of expansion of the product lines. *See Frisch's Rests.*, 670 F.2d at 648 (quoting *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348 (9th Cir. 1979)). To resist summary judgment in a case where the likelihood of confusion is the dispositive issue, a non-moving party must raise a genuine issue of material fact "concerning those of the *Frisch*'s factors which may be material in the context of a specific case." *Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir. 1991). This means "that the nonmoving party's burden is to identify a disputed factor or set of factors whose resolution would necessarily be dispositive on the likelihood of confusion issue." *TrafFix*, 200 F.3d at 934, *rev'd on other grounds*, 121 S. Ct. 1255. If we determine from the record that the undisputed factors favor the movant and regard (as we must) the disputed factors as favoring the non-movant, yet still conclude that the movant prevails on the legal question of confusing similarity, summary judgment for American may be affirmed. The record before this court, voluminous as it is, permits consideration of only one of the eight factors: the similarity of the trade dress.

A&F's Quarterly is described above. AE also uses the clothesline format to display its goods, although it puts significantly fewer garments on each page than A&F does and presents its clothes in a spare, as opposed to dense, fashion. AE uses colorbars and design bars underneath almost all its garments, while A&F does so occasionally, sometimes displaying several full-size images instead. The most striking visual difference between the catalogs lies in the photographs, which dominate the catalogs' overall content. Throughout the Quarterly, A&F makes extensive use of photographs depicting apparently college-aged people in often erotic or homoerotic poses or situations wearing clothes with A&F

Abercrombie could prevail on its trade dress infringement claim.

## E

In order to prevail on a § 43(a) claim, a plaintiff must establish the existence of a likelihood of confusion as to the source or origin of the plaintiff's and defendant's products. This court has held that "[t]he general concept underlying the likelihood of confusion is that the public believe that the [mark or dress] owner sponsored or otherwise approved the use of the trademark" or trade dress. *Carson v. Here's Johnny Portable Toilets, Inc.*, 698 F.2d 831, 834 (6th Cir. 1983); *see also Ashley Furniture Indus.*, 187 F.3d at 368 (explaining that § 43(a) forbids only passing off). In the district court, Abercrombie pointed to certain emails as evidence of actual confusion as to the source or sponsorship of American's products, but none of these made reference to the parties' catalogs. At this point, Abercrombie has had little opportunity to develop evidence of actual confusion or other evidence that would carry its burden of proving confusing similarity. Nevertheless, "[t]his court has made clear that likelihood of confusion is a question of law and thus an appropriate issue for summary judgment. The legal conclusion that confusion is likely must rest on the particular facts of the case, but when all of the material facts have been determined, the ultimate determination of likelihood of confusion lies within the exclusive jurisdiction of the court." *WSM, Inc.*, 709 F.2d at 1086 (citing *Frisch's Rests., Inc. v. Elby's Big Boy*, 670 F.2d 642 (6th Cir. 1982), and *Alpha Industries, Inc. v. Alpha Steel Tube & Shapes, Inc.*, 616 F.2d 440, 443-44 (9th Cir. 1980)). Even so, we may resolve this case on the evidence before us if A&F is wholly incapable of producing evidence that the design of the two catalogs is "likely to cause confusion" in prospective purchasers' minds as to the source or sponsorship of the catalog or the goods it contains. *See TrafFix*, 200 F.3d at 933, *rev'd on other grounds*, 121 S. Ct. 1255.

paper, page layouts, lifestyle editorial content, manner of displaying merchandise, and typeface in American's catalog are identical or confusingly similar to the Quarterly. Abercrombie introduced a memorandum from American marketing executives directing American store managers to inspect the windows, lead table, and leaseline signs of Abercrombie stores every week and report on A&F's presentation. ("Attention store manager – We need you to tell us what *Abercrombie & Fitch* is marketing!!!").[1]   During litigation in the district court, American declined to contest the allegation that it intentionally copied the various aspects of Abercrombie's claimed trade dress enumerated in the complaint.

On June 2, 1998, Abercrombie filed suit in the district court claiming that American infringed upon its unregistered trade dress, in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), the Ohio common law of trade dress protection and unfair competition, and the Ohio Deceptive Trade Practices Act, O.R.C. § 4165.01 *et seq.*[2]   American served its Answer on August 3, 1998, and simultaneously filed its motion for summary judgment. On November 30, 1998, the district court granted in part American's motion to stay discovery: the court ruled that discovery on the issue of American's intentional copying was inappropriate during the pendency of American's summary judgment motion because American

---

[1] The district court's opinion on American's motion for summary judgment overlooked or discounted this evidence, remarking on "the absence of any allegation that through in-store displays . . . American Eagle has recreated the A&F look within its stores."

[2] Both Ohio and federal courts have recognized that the same analysis applies to claims under Ohio's statutory and common law of unfair competition and the Lanham Act. *See Leventhal & Assocs., Inc. v. Thomson Cent. Ohio*, 714 N.E.2d 418, 423 (Ohio Ct. App. 1998); *Barrios v. American Thermal Instruments, Inc.*, 712 F. Supp. 611, 613-14 (S.D. Ohio). Since the same law applies to all claims, this opinion addresses only judicial interpretation of the Lanham Act.

had admitted intentional copying for purposes of the motion, but the court permitted discovery on the question of use of similar designs and marketing approaches by third-party retailers, which issue American raised in its motion.

On July 12, 1999, the district court granted American's motion for summary judgment in its entirety. The court recognized that unregistered trade dress protection can extend to "the image and overall appearance of the product." The court described trade dress as 1) either a singular feature or combination of features that takes on a distinct arrangement, 2) intended by the maker to permit the public to identify it as coming from a particular source, and 3) having a tendency to do so. The court noted that trade dress is protectable under either of two circumstances: the dress is inherently distinctive or has acquired secondary meaning. The district court assumed, for purposes of the motion, that Abercrombie's arrangement of words, colors, and format had acquired secondary meaning, but reasoned that the motion turned on the question of whether the elements described in Abercrombie's complaint constituted trade dress at all. According to the district court, trade dress protection is not available when a) the means of dressing the product is functional or descriptive, or b) the claimed trade dress amounts to an abstract image or marketing approach.

The court concluded that, regardless of any public identification of the claimed trade dress with Abercrombie, "it is simply too descriptive and generic to qualify for Lanham Act protection." The court remarked, "retailers must be free to use common verbal or pictorial descriptions of their goods . . . [including] such matters as showing the clothing in 'cutout' fashion . . . using combinations of standard colors . . . universally-recognized patterns . . . and common fabrics . . . in clothing design and manufacture. . . . All of these factors are both generic and descriptive . . . ."

The Court recognize[d] that a combination of generic or descriptive elements can sometimes create a unique look

included so-called lifestyle editorial content for some time.[23] But mail order retailers can still sell their clothes and create an aura about their products without including such content, although this method seems to have recently become a particularly effective way of creating demand. At the very least, the evidence in the record creates a genuine issue of material fact as to whether protection of the design features chosen by Abercrombie for its catalog leaves open sufficient comparable alternate methods of marketing clothing to young people by mail, such that granting A&F a monopoly on its distinctive configuration would not hinder the ability of another manufacturer to compete effectively in the market. Here, the Seventh Circuit's verbal formulation of the issue seems particularly apt: "whether the [combination of] feature[s] . . . is something that other producers of the product in question would have to have as part of [their catalog] in order to be able to compete effectively in the market . . . or whether it is the kind of merely incidental [configuration] which gives the brand some individual distinction but which producers of competing brands can readily do without." *W.T. Rogers Co.*, 778 F.2d at 346.

Abercrombie claimed three "things" as its trade dress. Its clothing designs and its in-store presentation are not protectable because they are functional, despite their distinctiveness. As to the overall design of the A&F Quarterly, however, we will assume that it satisfies the distinctiveness and non-functionality conditions for protectability because, for purposes of the instant appeal, American conceded secondary meaning and the record evidence raises genuine issues as to the material fact of non-functionality. We therefore proceed to assess whether

---

[23] *See* Laura Bird, *Advertising Beyond Mail Order: Catalogs Now Sell Image, Advice*, THE WALL STREET JOURNAL (July 29, 1997) ("'A&F Quarterly' is just the latest retail catalog to blur the distinction between mail-order and magazine . . . . Unlike traditional mail order books, these thick, glossy 'magalogs' are designed primarily as advertising vehicles to sell a certain image and bring shoppers into stores.").

presumably, selling clothes. But that does not make the catalog's overall design functional. Nor does the presence of many functional elements in the Quarterly's design. Even if the elements Abercrombie identifies were all separately functional, as American argued and the district court held, A&F's arrangement of these features can constitute more than the sum of its non-protectable parts. *See Publications Int'l, Ltd. v. Landoll, Inc.*, 164 F.3d 337, 341-43 (7th Cir. 1998) (holding various elements of a cookbook's design functional but recognizing that their appearance in concert could garner legal protection "unless it was the only way the product *could* look, consistent with its performing each of the product's functions optimally"); *Tools USA & Equip.*, 87 F.3d at 658-59 (treating certain aspects of a catalog as functional but allowing trade dress protection of the catalog's design as a whole); *see also Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 842 (9th Cir. 1987).

A&F has chosen to print its catalog on an unusual kind of paper, leaving competitors a variety of other paper options. The clothes offered for sale appear in "clothesline" or "cutout" form (the garments appear on the page as if hanging from a clothesline, *i.e.*, not on a model), while many catalogs show garments on a model or display them in other ways. Colorbars are a useful mechanism for communicating the available selection of colors, but the same information can be provided in a handful of other ways. Abercrombie uses grainy images of exceptionally fit and attractive young people in outdoor (often collegiate) settings, alone and in groups, wearing more or less A&F clothing in ways that convey their allegiance to the brand while also seemingly attempting to create a sexual mystique about the wearer. The Quarterlies in the record rarely deviate from this pattern, but clothing retailers have an infinite variety of options for surrounding their clothes with pleasing or desirable imagery that avoids showing scantily clad college students in a grainy photograph. Finally, the record demonstrates that clothing catalogs have

that is protectable, but there is nothing arbitrary or fanciful, or in any way distinctive, about the combination of these elements in a clothing catalog that would make the whole of the "Abercrombie Brand," at least as it relates to the descriptive language, color combinations, and cutout style, something more than the sum of its non-protectable parts. That observation applies equally to the use of words claiming that the clothing is "authentic" and the use of A&F's own trademark . . . .

The court lastly considered the "element of the Abercrombie Brand" comprising its method of appealing to the "cool" or "cutting edge" consumer by adding lifestyle content to its catalog, and held that "the concept of marketing products to 'cool' or 'cutting edge' consumers by appealing to other aspects of their lifestyle [is not] protectable." The court entered judgment for American. A&F moved for reconsideration, pursuant to Fed. R. Civ. P. 59(e), introducing certain email messages as evidence of consumer confusion. The court doubted whether the evidence was newly discovered, but examined and rejected it as irrelevant to the district court's judgment, which turned not on secondary meaning or confusion but on the unprotectable nature of Abercrombie's claimed trade dress. Abercrombie timely appealed.

## II

We turn first to a threshold issue: the timing of summary judgment. "[S]ummary judgment is improper if the non-movant is not afforded a sufficient opportunity for discovery." *Vance v. United States*, 90 F.3d 1145, 1148 (6th Cir. 1996) (citing *White's Landing Fisheries, Inc. v. Buchholzer*, 29 F.3d 229, 231-32 (6th Cir. 1994)); *accord Plott v. General Motors Corp.*, 71 F.3d 1190, 1195 (6th Cir. 1995) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5 (1986)). The non-movant bears the obligation to inform the district court of its need for discovery, however. This court reviews for abuse of discretion a claim that

summary judgment was prematurely entered because additional discovery was needed, and the argument is not preserved for appeal unless it is first advanced in the district court. *See Vance*, 90 F.3d at 1149 (citing *Plott*, 71 F.3d at 1196). Thus, before a summary judgment motion is decided, the non-movant must file an affidavit pursuant to Fed. R. Civ. P. 56(f) that details the discovery needed, or file a motion for additional discovery. If he does neither, "this court will not normally address whether there was adequate time for discovery." *Plott*, 71 F.3d at 1196. If the non-movant makes a proper and timely showing of a need for discovery, the district court's entry of summary judgment without permitting him to conduct any discovery at all will constitute an abuse of discretion. *See White's Landing Fisheries*, 29 F.3d at 231-32.

Although American filed its answer, its summary judgment motion, and its motion to stay discovery simultaneously, the district court resolved the two motions separately. In responding to the motion to stay discovery, which the court addressed first, Abercrombie filed neither a Fed. R. Civ. P. 56(f) affidavit nor requests for additional discovery. However, its memorandum in opposition to the motion explained its need for discovery and cited *White's Landing Fisheries*, 29 F.3d at 231-32, in support of its position that staying discovery would prejudice its ability to respond to American's summary judgment motion. Abercrombie has preserved the issue of adequate discovery for our review because requiring, as a part of its response to the summary judgment motion, a Rule 56(f) affidavit, a fresh motion for new discovery, or recitation of arguments rejected by the district court in the order staying discovery simply to preserve the matter would ignore Abercrombie's arguments in opposition to the simultaneously filed motion for stay and

trademarks on clothing bearing certain generic designs (unspecified "solid, plaid, and stripe designs," without more, are indisputably generic) made from generic fabrics would undoubtedly force these competitors to spend money to design around Abercrombie's creations. There can be no dispute that preventing other producers from combining these design elements in the way Abercrombie does would prevent them from competing effectively in the market for casual clothing aimed at young people. No reasonable jury could find to the contrary. Remand for further proceedings in the district court on this question would be a waste of judicial resources, not to mention the parties' time and money.

We reach the same conclusion with respect to Abercrombie's claim of trade dress in its in-store display setups[21] and use of college students as sales associates. Forbidding clothiers to use college students to sell garments to or for college-age people indubitably prevents them from effectively competing in the market for casual clothing directed at young people.

Abercrombie's catalog is a different matter entirely.[22] Of course, the Quarterly has certain functions, including "the creation of a cutting edge 'cool' Abercrombie image," and,

---

[21] Abercrombie's failure to describe these setups in its complaint and its brief or include a depiction of one in the record indicates that its claim of trade dress in its in-store presentation lacks sufficient particularity. *See supra* Part III.B.

[22] Again, for ease of reference, A&F describes its catalog's trade dress thus: "the creation of a cutting edge 'cool' Abercrombie image through photographs and advertising and promotional material . . . which presents the Abercrombie Brand and Trade Dress in a unique manner, namely, it features the Abercrombie Brand and Trade Dress in a 'cutout' or 'clothesline' style and uses color bars to illustrate the available colors of goods, while combining a consistent conceptual theme with a lifestyle editorial content of music, electronics, books, and magazine features and is printed on cougar vellum paper which is unique for a catalog." Compl. ¶ 7(h).

Giving Abercrombie a monopoly on the words its claims form part of its trade dress would hamstring any competitor's ability to convey the reliability of its own brand. The English language currently contains a limited list of synonyms for reliable and other words that convey a product's integrity. While Abercrombie designers deserve credit for using the company's age as a creative indicator of their products' reliability, few other verbal formulations adequately or efficiently convey this concept. The same is true of using suggestive symbols like lacrosse sticks and the ski patrol cross on clothing to convey the product's athletic nature or capacity to invoke images of athleticism. Producers have a limited range of sports and sporting equipment to choose from in attempting to convey this idea in this manner on clothing.[20] Producers could go without such images or devise wholly new ways of conveying the athleticism concept in connection with casual clothing, but at present these features are ones that "competitors would have to spend money not to copy but to design around." *W.T. Rogers Co.*, 778 F.2d at 340. The lack of comparable alternatives to pleasing design features means that granting an injunction would deny consumers the benefits of a competitive market. In short, these design features are "something that other producers of the [casual clothing] have to have as part of the product in order to be able to compete effectively in the market . . . [it is not] the kind of merely incidental feature which gives the brand some individual distinction but which producers of competing brands can readily do without." *Id.* at 346.

Finally, Abercrombie is not saved by its characterization of its trade dress as the *combination* of different design features on its clothing: denying American or other producers the right to combine these functional design features with their own

---

[20]We were hard-pressed to think of many sports whose equipment has not yet been used on clothing that appears in the record, and it may be only a matter of time before one of the parties displays fencing paraphernalia on its garments in order to invoke the particular image of athleticism and class that accompanies that sport.

unduly exalt form over substance. Making the arguments once is enough.[3]

The district court's November 30, 1998, order granting American's motion to stay discovery recited

the Court's view that additional evidence of intentional copying at this stage [beyond American's limited admission] would not add materially to the Court's analysis of the protectability of A&F's trade dress as placed in issue by American Eagle's summary judgment motion. Under all of these circumstances, the Court believes that the best course of action is to defer discovery of highly sensitive and competitive information until after this threshold question [of the existence of protectable trade dress] has been addressed.

Abercrombie argues that, beyond evidence of intentional copying, it sought "discovery concerning the *uniqueness* of the Abercrombie Trade Dress, which had acquired secondary meaning among consumers, and concerning the *likelihood of confusion* with the American Trade Dress." Appellant's Br. at 39 (emphasis added). Abercrombie believes further discovery would have substantiated its claims that a) American intentionally copied the Abercrombie trade dress to capitalize on its goodwill, b) consumers perceive the Abercrombie trade dress as being unique to Abercrombie, and c) American's consumers are actually confused as to whether there is an association between the two companies. *See* Appellant's Br. at 41. Abercrombie correctly argues that such evidence would have raised a genuine issue of material fact as to whether Abercrombie had protectable trade dress, but it fails to realize that such evidence would have done so by demonstrating the existence of distinctiveness acquired through attachment of secondary meaning. Since the record

---

[3]That Abercrombie appealed only from the grant of summary judgment and not the order staying discovery is likewise of no moment. A stay of discovery is not a final appealable order.

already contained extensive uncontested evidence of secondary meaning, such discovery prior to the district court's resolution of American's motion would have been unnecessarily duplicative. Abercrombie needed no further discovery to oppose American's motion, and the motion was ripe for resolution at the time the district court considered it. Because this opinion resolves the case in certain ways not expressly addressed by the district court, we note that none of the facts A&F wished to discover goes to the question of functionality, and, as discussed *infra* pages 37-44, the fact of actual consumer confusion here would not create a genuine issue of material fact on the question of confusing similarity of the parties' catalogs because we presently resolve a legal question and hold them not confusingly similar as a matter of law.

## III

### A

This court reviews a district court's grant of summary judgment de novo. *See Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 279-80 (6th Cir. 1997). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The court will view the facts, and all inferences to be drawn from them, in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The non-moving party, in answering a properly supported motion for summary judgment, must show a genuine issue necessitating trial. *See Fox v. Van Oosterum*, 176 F.3d 342, 347 (6th Cir.1999). Such an issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. at 248. Because this court's de novo review involves

We turn first to Abercrombie's clothing designs.[19] Abercrombie's complaint itself identifies the functions of the design elements it selected: use of the word *performance* "convey[s] the image of an active line of . . . clothing"; use of the words *authentic*, *genuine brand*, *trademark*, and *since 1892* "convey the reliability of the . . . brand;" and so on. Use of these elements in combination with one another and with Abercrombie's trademarks on clothing bearing "primary color combinations . . . in connection with solid, plaid and stripe designs" and made from "all natural cotton, wool and twill fabrics" creates reliable rugged and/or athletic casual clothing drawn from a consistent texture, design, and color palette. Were the law to grant Abercrombie protection of these features, the paucity of comparable alternative features that competitors could use to compete in the market for casual clothing would leave competitors at a significant non-reputational competitive disadvantage and would, therefore, prevent effective competition in the market.

---

[19]For ease of reference, we here reprint the features Abercrombie claims comprise the trade dress of its garment designs: "a) use of the Abercrombie Marks, in particular the A&F trademark in universe bold condensed typeface; b) use of the word *performance* on labels and advertising and promotional material to convey the image of an active line of casual clothing; c) use of such words and phrases as *authentic*, *genuine brand*, *trademark*, [and] *since 1892* on labels and advertising and promotional material to convey the reliability of the Abercrombie Brand; d) use of the word *outdoor* on labels and advertising and promotional materials to convey the image of a rugged outdoor line of casual clothing; e) use of design logos, such as the ski patrol cross and lacrosse sticks, and product names for the types of clothing, such as "*field jersey*," to convey the image of an athletic line of casual clothing; f) use of primary color combinations, such as red, blue, grey, tan and green in connection with solid, plaid and stripe designs, to create a consistent design and color palette, g) use of all natural cotton, wool and twill fabrics to create a consistent texture palette . . . ." Compl. ¶ 7. The last two features are obviously functional standing alone. And American has not directly copied the first feature, the use of *Abercrombie's* trademarks; it has used its own. It seems, then, that Abercrombie meant to define its trade dress as including some or many of the features labeled b) through e) in combination with the last two features and the producer's own trademark.

trade dress protection for a product's feature would hinder the ability of another manufacturer to compete effectively in the market for the product. If such hinderance is probable, then the feature is functional and unsuitable for protection. If the feature is not a likely impediment to market competition, then the feature is nonfunctional and may receive trademark protection." *Id.* at 1149 (footnotes omitted).[18]   The same principle applies to trade dress law. *See Two Pesos*, 505 U.S. at 768.

---

*Rogers Co.*, 778 F.2d at 339.

[18]As the Seventh Circuit explained: "[I]t would . . . be unreasonable to let a manufacturer use trademark law to prevent competitors from making pleasing substitutes for his own brand; yet that would be the effect of allowing him to appropriate the most pleasing way of configuring the product." *W.T. Rogers Co.*, 778 F.2d at 340. In this sense, functionality depends on "whether the feature . . . is something that other producers of the product in question would have to have as part of the product in order to be able to compete effectively in the market— in other words, in order to give consumers the benefits of a competitive market— or whether it is the kind of merely incidental feature which gives the brand some individual distinction but which producers of competing brands can readily do without." *Id.* at 346.

only application of legal propositions to the undisputed facts in the record, we may affirm on any grounds supported by the record even if different from the reasons of the district court. *See Holloway v. Brush*, 220 F.3d 767, 772 (6th Cir. 2000) (en banc) (citing *Andrews v. Ohio*, 104 F.3d 803, 808 (6th Cir. 1997)); *City Management Corp. v. United States Chem. Co.*, 43 F.3d 244, 251 (6th Cir. 1994); *Russ' Kwik Car Wash, Inc. v. Marathon Petroleum Co.*, 772 F.2d 214, 216 (6th Cir. 1985)). *See also WSM, Inc. v. Tennessee Sales Co.*, 709 F.2d 1084, 1086 (6th Cir. 1983) (holding that the likelihood of trademark confusion can be a question of law appropriate for determination on a motion for summary judgment).

### B

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), protects from infringement the unregistered "trade dress" of a product. As explained more fully below, to recover for trade dress infringement under § 43(a), a party must prove by a preponderance of the evidence: 1) that the trade dress in question is distinctive in the marketplace, thereby indicating the source of the good it dresses, 2) that the trade dress is primarily nonfunctional, and 3) that the trade dress of the competing good is confusingly similar. *See Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210 (2000); *see also Ferrari S.P.A. Esercizio Fabriche Automobili E Corse v. Roberts*, 944 F.2d 1235, 1239 (6th Cir. 1992). The first two elements are the requirements for protectability, and the third element is the standard for evaluating infringement. As an initial matter, this case calls upon us to resolve a conceptually precedent question: What type of "thing" can, if it satisfies the two protectability criteria, qualify as trade dress? In the words of the district court, is what A&F described in its complaint "'trade dress' at all"?

"'Trade dress' refers to 'the image and overall appearance of a product.' It embodies 'that arrangement of identifying characteristics or decorations connected with a product, whether by packaging or otherwise, [that] make[s] the source

of the product distinguishable from another and . . . promote[s] its sale.'" *Ferrari*, 944 F.2d at 1238-39 (quoting *Allied Mktg. Group, Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 812 (5th Cir. 1989), and *Mr. Gasket Co. v. Travis*, 299 N.E.2d 906, 912 n.13 (Ohio Ct. App. 1973)). Trade dress "'involves the total image of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques.'" *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 764 n.1 (1992) (quoting *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 980 (11th Cir. 1983) (citing *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*, 684 F.2d 821, 831 (11th Cir. 1982) ("adoption procedures used by [plaintiff] in the sale of its dolls qualify as protectable trade dress"), and *SK & F Co. v. Premo Pharm. Labs., Inc.*, 481 F. Supp. 1184, 1187 (D.N.J. 1979) (stating that "[t]rade dress is a complex composite of features" including, *inter alia*, size, color, texture, and graphics, which must "be considered together, not separately"), *aff'd*, 625 F.2d 1055 (3d Cir. 1980))).

As the Second Circuit observed, recently "'trade dress' has taken on a more expansive meaning and includes the design and appearance of the product as well as that of the container and all elements making up the total visual image by which the product is presented to customers." *Jeffrey Milstein, Inc. v. Gregor, Lawlor, Roth, Inc.*, 58 F.3d 27, 31 (2d Cir. 1995). *Ferrari* similarly endorsed a very broad concept of trade dress, one that went beyond the products' packages and designs.[4] *See Ferrari*, 944 F.2d at 1238-39. According to MCCARTHY ON TRADEMARKS § 8:4, trade dress has been held to include such things as: the cover of a book, a magazine cover design, the use of a lighthouse as part of the design of a golf hole, the "G" shape of a Gucci watch, a combination of features of a folding table, a fish-shaped cracker, the "Marlboro Man" western cowboy motif, and, most notably for

---

[4]"Product configuration" seems to have become the vogue term replacing "product design."

The two most common "tests" of aesthetic functionality under the competition theory prove useful in this case. "The test for 'comparable alternatives' asks whether trade-dress protection of certain features would nevertheless leave a variety of comparable alternative features that competitors may use to compete in the market. If such alternatives do not exist, the feature is functional; but if such alternatives do exist, then the feature is not functional." Wong, 83 CORNELL L. REV. at 1144-45 (noting that "[t]he comparable alternatives requirement may necessitate more than the mere existence of one alternative, and may instead require a number of alternatives from which competitors may choose") (footnotes omitted).[17] "The 'effective competition' test asks . . . whether

---

manufacturer, it would be functional and could not be trademarked. But a trademark, especially when it is part of the product, rather than being just the brand name, is bound to be selected in part to be pleasing; so this definition of functionality could rule out trademark protection for design features. [It is also error to consider a feature functional] 'when it serves to provide a reason for purchase which is unrelated to the fact that the source of the product is a particular manufacturer.' *A reason*— not the most important or even equally important reason; hence [under this reasoning] a pleasing trade name, symbol, or design feature cannot be trademarked. . . . [T]he fact that a design feature is attractive does not . . . preclude its being trademarked. If effective competition is possible without copying that feature, then . . . it is not a functional feature." *W.T. Rogers Co. v. Keene*, 778 F.2d 334, 341-43 (7th Cir. 1985). Because the Supreme Court has never intimated that aesthetic functionality should be evaluated in a manner consistent with the identification theory and has repeatedly followed the competition theory's approach in addressing the second form of functionality, *see TrafFix*, 121 S. Ct. at 1261-62 (explaining *Qualitex*), we expressly adopt the competition theory of functionality.

[17]The Seventh Circuit described the comparable alternatives problem thus: "a functional feature is one which competitors would have to spend money not to copy but to design around, as they would have to do if they wanted to come up with a nonoval substitute for a football. It is something costly to do without (like the hood [of a car] itself), rather than costly to have (like the statue of Mercury [decorating the hood])." *W.T.*

comment did not displace the traditional functionality standard from *Inwood Laboratories*. Instead it explained the policy underlying the functionality doctrine in a way readily adaptable to the problem of aesthetic functionality, the issue presented in *Qualitex*. *See TrafFix*, 121 S. Ct. at 1261-62. Thus, the "significant non-reputation-related disadvantage" to competitors approach is the second form of trade dress functionality.

   None of the design features that Abercrombie claims as its trade dress is essential to the use or purpose of the garments, catalog, and stores they adorn. The design features surely affect the cost and quality of the garments and the design of the catalog affects its cost and aesthetics (which determines, in part, its quality as a device for selling clothing), so a jury question exists as to whether the designs are functional in the traditional sense. However, no reasonable jury could deny the existence of a "significant non-reputation-related disadvantage" that would be imposed on competitors by protecting Abercrombie's claimed trade dress. That form of functionality governs the analysis of this case.[16]

---

[16] For quite some time, the circuits have disagreed about the most appropriate theory of functionality to use in aesthetic functionality cases. Courts have divided between those recognizing the identification theory (which at times employed the "indicia of source," "actual benefit," "consumer motivation," and "commercial success" tests of a feature's capacity to identify the manufacturer to consumers) and the competition theory (which at times employed the "comparable alternatives," "essential to usage," "relation to usage," "ease of manufacture," and "effective competition" tests of whether granting a monopoly on a feature would prevent other suppliers from competing in the market for the product). *See* Mitchell M. Wong, *The Aesthetic Functionality Doctrine and the Law of Trade Dress Protection*, 83 CORNELL L. REV. 1116, 1132-52 (1998). The Seventh Circuit explained its adoption of the competition theory by identifying problems with the identification theory: it held that it is error to

define nonfunctional as serving primarily to identify the manufacturer. Understood literally, this would mean that if a particular design feature had two equally important purposes, one to please consumers and the other to identify the

---

our purposes, the layout and appearance of a mail-order catalog, *see Tools USA & Equip. Co. v. Champ Frame Straightening Equip.*, 87 F.3d 654 (4th Cir. 1996). Because we can conceive of no "thing" inherently incapable of carrying meaning, any "thing" can come to distinguish goods in commerce and thus constitute a mark within the meaning of the Lanham Act. *See Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 162 (1995).[5] In short: any "thing" that dresses a good can constitute trade dress.[6] Protectability is another matter entirely.

   Still, the notion that any "thing" that dresses a good can constitute trade dress cannot be divorced from the underlying concept of trade dress law: protection of effable markers used to identify the source of a good in commerce. Although producers and marketers of goods can adopt and seek to protect a seemingly infinite variety of product packages and product configurations, the recognition that trade dress can comprise "any thing," "'even particular sales techniques,'" *Two Pesos, Inc.*, 505 U.S. at 764 n.1 (quoting *John H. Harland Co.*, 711 F.2d at 980), should not be taken to mean that a company can protect a product's marketing theme or any other incorporeal aspects of the good incapable of being perceived by the senses. The aura about a product, the cachet that ownership or display of it creates, and the kind of appeal

---

[5] The Court wrote:
The language of the Lanham Act describes [the universe of things that can qualify as a trademark] in the broadest of terms. It says that trademarks 'includ[e] any word, name, symbol, or device, or any combination thereof." [15 U.S.C.] § 1127. Since human beings might use as a "symbol" or "device" almost anything at all that is capable of carrying meaning, this language, read literally, is not restrictive.
*Qualitex*, 514 U.S. at 162.

[6] As the Supreme Court observed, § 43(a) "provides little guidance as to the circumstances under which unregistered trade dress may be protected," but courts have successfully reasoned by analogy to the conditions for trademark protection. *Samara Bros.*, 529 U.S. at 210.

it has to certain consumers do not dress a good in trade. Rather, those intangible "things" emanate from the good, its dress, and the marketing campaign that promotes the dressed good. Trade dress is tangible or otherwise objectively observable by the senses; its constitution is a matter of subjective interpretation. Lest we lose sight of the body of law here in question, that of trade *dress*, we are reminded that certain "things" held out as "dress" are not dress at all. HANS CHRISTIAN ANDERSEN, THE EMPEROR'S NEW CLOTHES (Naomi Lewis, trans., Candlewick Press, 1997) (1837). With this in mind, we turn to American's argument and the district court's holding that Abercrombie seeks to protect its marketing theme.

American, like the district court, draws a contrast between trade dress and a "marketing approach." *See generally Haagen-Dazs v. Frusen Gladje, Ltd.*, 493 F. Supp. 73, 75 (S.D.N.Y. 1980). *Haagen-Dazs* and the Eighth Circuit's *Prufrock* are the leading cases distinguishing between protectable trade dress and a "mere method or style of doing business." *Prufrock Ltd. v. Lasater*, 781 F.2d 129, 131-32 (8th Cir. 1986), *abrogated in part by Two Pesos*, 505 U.S. 765. In *Prufrock*, the district court had defined the plaintiff's trade dress as "a full service restaurant, serving down home country cooking, in a relaxed and informal atmosphere, with a full-service bar, and which employs all or any of [eight specifically described] items." *Id*. at 131. The Eighth Circuit held that inclusion of the "'core concept' of Prufrock's restaurant" in an injunction defined its trade dress too broadly because "[t]he concept of informal country dining is merely the method Prufrock has chosen to market its restaurant services." *Id.* at 131-32. Regardless of whether the specifically described elements were entitled to trade dress protection through inherent or acquired distinctiveness, the

Protection of functional product features is the province of patent law, which confers a monopoly over new product designs for a limited time only, after which competitors are free to copy at will. *See id*. As the Supreme Court advised, "[t]rade dress protection must subsist with the recognition that in many instances there is no prohibition against copying goods and products. In general, unless an intellectual property right such as a patent or copyright protects an item, it will be subject to copying." *TrafFix*, 121 S. Ct. at 1260. After all, copying preserves competition, which keeps downward pressure on prices and encourages innovation.

Congress resolved a circuit split regarding the "defense of functionality" by declaring that the burden of proof rests on the plaintiff to prove non-functionality. *See* 15 U.S.C. § 1125(a)(3). Given the evidence in the record, we see no possibility that Abercrombie can carry its burden of proof with respect to the nonfunctionality of its clothing designs.

Courts have recognized that "the functionality doctrine may apply even to features of a product that are purely ornamental." *Knitwaves*, 71 F.3d at 1006 (citing *Wallace Int'l Silversmiths, Inc. v. Godinger Silver Art Co.*, 916 F.2d 76, 79-81 (2d Cir. 1990)). And the Supreme Court, while "caution[ing] against misuse or over-extension of trade dress . . . noted that 'product design almost invariably serves purposes other than source identification.'" *TrafFix*, 121 S. Ct. at 1260 (explaining and quoting *Samara Bros.*, 529 U.S. at 213). In *TrafFix*, the Court identified two forms of functionality. The first, traditional functionality, deems a feature functional when "'it is essential to the use or purpose of the device or when it affects the cost or quality of the device.'" *Qualitex*, 514 U.S. at 165 (quoting *Inwood Labs.*, 456 U.S. at 850 n.10). *Qualitex* "[e]xpand[ed] upon the meaning of this phrase [by] observ[ing] that a functional feature is one the 'exclusive use of which would put competitors at a significant non-reputation-related disadvantage.'" *TrafFix*, 121 S. Ct. at 1261 (quoting *Qualitex*, 514 U.S. at 165). But the competitive disadvantage

is, for purposes of this opinion, an established fact. Thus, A&F successfully cleared the distinctiveness hurdle. The district court erred in granting summary judgment to American on the grounds that Abercrombie's trade dress lacked distinctiveness.

Much of the district court's opinion reveals a concern for the anti-competitive effect of a judgment for Abercrombie insofar as competitors like American could be left unable to market their goods efficiently and effectively or to design clothes that would compete with A&F's.[15] Concern for realistic competition in a given industry has a place in trade dress law: the functionality doctrine. Because the record now before this court documents the functionality of certain designs that Abercrombie claims as its trade dress, our de novo review leads us to the conclusion that the district court's judgment for American is supported by a legal determination not expressly reached below.

### D

The Supreme Court recently reaffirmed the policy that functional product designs cannot be protected as trade dress. *See TrafFix*, 121 S. Ct. at 1259-60. The functionality doctrine "prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature." *Qualitex*, 514 U.S. at 164.

---

[15] Addressing its comments primarily to Abercrombie's attempt to protect the design of the Quarterly, the district court opined that protecting a marketing style or method would unduly interfere with competitors' right to depict their products fairly. The court observed, "Within the scope of advertising certain types of clothing, retailers must be free to use common verbal or pictorial descriptions of their goods without fear that they can be held liable for infringement. At a minimum, those would include such matters as showing the clothing in "cutout" fashion, . . . using combinations of standard colors . . . universally-recognized patterns . . . and common fabrics . . . in clothing design and manufacture. . . . All of these factors are both generic and descriptive . . . ."

restaurant's overall theme, informal country dining, could not acquire such protection.[7]

Similarly, the *Haagen-Dazs* court concluded that, despite the plaintiffs' identification of five common features on two ice cream packages, "the containers in issue, as well as their dress, [were] clearly distinguishable and would appear so to all but the most obtuse consumer." *Haagen-Dazs, Inc.*, 493 F. Supp. at 75. With no likelihood of actual confusion, the plaintiff could not prevail on an elemental or "overall appearance" trade dress claim, so it tried to convert evidence that Frusen-Gladje had copied certain unprotectable trade dress into a much broader claim that Haagen-Dazs had a right to exclusive use of its Scandinavian concept. The court concluded that the plaintiff failed "to appreciate the difference between an attempt to trade off the goodwill of another and the legitimate imitation of an admittedly effective marketing technique. In fact, plaintiff attempt[ed] to significantly broaden its protected 'trademark' to include its so-called 'unique Scandinavian marketing theme.'" *Ibid*. Because a marketing theme cannot constitute trade dress, the court refused to enjoin Frusen Gladje from trading on Nordic imagery.

Abercrombie describes its trade dress as creating a variety of different images: "an active line of casual clothing," "a rugged line of casual clothing," "an athletic line of casual clothing," and "a cutting edge 'cool' Abercrombie image." But Abercrombie does not claim a monopoly on a cutting

---

[7] After concluding that the eight identified elements of purported trade dress were not inherently distinctive and had not acquired secondary meaning, the Eighth Circuit opined in dicta that the eight elements were functional because they were chosen to respond to consumer demand for the core concept of informal country dining. *See Prufrock*, 781 F.2d at 134 (using an understanding of functional that conflicts with this court's approach to functionality, *see infra* Part III.D, and has been called into question by the result in *Two Pesos*, *see Home Builders Assoc. v. L & L Exhibition Mgmt. Inc.*, 226 F.3d 944, 948 (8th Cir. 2000)).

edge "cool" image. Instead, Abercrombie seeks protection of the *design features* that it claims have combined to become distinctive of its goods in commerce. For example, in describing one element included as part of its overall trade dress, Abercrombie lists "use of the word *outdoor* on labels and advertising and promotional material to convey the image of a rugged outdoor line of casual clothing." Compl. ¶ 7(d). Fairly understood, Abercrombie does not seek to forbid American from marketing clothes that convey the image of a rugged outdoor line of casual clothing, but instead seeks to prevent American from doing so by using the word *outdoor* in combination with other aspects of Abercrombie's trade dress that have supposedly come to signify Abercrombie as the source of the goods.

Abercrombie's complaint is a bit perplexing: it describes its "trade dress" as comprising all nine of the features identified *supra* pages 3-4. If its trade dress really comprises all nine elements acting in concert to create its overall look, an injunction to prohibit marketing a line of clothing bearing a confusingly similar overall look would probably do the company little good, as American could easily drop a few items from its line, *e.g.*, stop using the word *performance*, and thereby begin marketing a dissimilar line of products. Conversely, under such a broad theory of the case, Abercrombie's introduction of a new design, *e.g.*, using fencing foils on t-shirts, would alter the form of its trade dress and potentially permit infringement of the newly conceived trade dress in the absence of an expanded injunction. Also, Abercrombie's description of its trade dress seems at times internally inconsistent: query whether clothing can at once convey an "active," a "rugged," an "athletic," and a "cool" image. Moreover, some of Abercrombie's descriptions are rather broad: consider "use of all natural cotton, wool, and twill fabrics to create a consistent texture palette." Compl. ¶ 7(g). And its inclusion of the catalog and the sales associate teams as trade dress of its clothing stretches the boundaries of trade dress law.

registration of a mark used by the applicant which has become distinctive of the applicant's goods in commerce'— that is, which is not inherently distinctive but has become so only through secondary meaning"). This court has long held that "evidence of intentional copying shows the strong secondary meaning of [a product] because '[t]here is no logical reason for the precise copying save an attempt to realize upon a secondary meaning that is in existence.'" *Ferrari*, 944 F.2d at 1239 (quoting *Audio Fidelity, Inc. v. High Fidelity Recordings, Inc.*, 283 F.2d 551, 558 (9th Cir. 1960)). American's limited admission of intentional copying constitutes evidence that Abercrombie's dress has acquired strong secondary meaning. A&F introduced other evidence confirming the existence of secondary meaning in its trade dress, including an affidavit from Abercrombie's CFO accompanied by exhibits in the form of emails purportedly from consumers remarking on the similarity of designs and advertising methods and inquiring about the relationship between Abercrombie and American. Abercrombie considers this as evidence of actual confusion by consumers and as further support for its claim of secondary meaning. Normally, this evidence would create a genuine issue of material fact as to secondary meaning.[14] In this case, the district court assumed that Abercrombie's trade dress had acquired secondary meaning. Given American's limited admission of copying and failure to introduce evidence contesting Abercrombie's claim of secondary meaning, the existence of secondary meaning associated with Abercrombie's trade dress

---

[14]This court has applied a seven-factor test for determining the existence of secondary meaning in trade dress. *See Marketing Displays, Inc. v. TrafFix Devices, Inc.*, 200 F.3d 929, 937 (6th Cir. 2000), *rev'd on other grounds sub nom. TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 121 S. Ct. 1255 (2001). That test looks to: (a) direct consumer testimony; (b) consumer surveys; (c) exclusivity, length, and manner of use; (d) amount and manner of advertising; (e) amount of sales and number of customers; (f) established place in the market; and (g) proof of intentional copying. *See Echo Travel, Inc. v. Travel Assoc., Inc.*, 870 F.2d 1264, 1267 (7th Cir. 1989).

design fall short of the distinctiveness requirement because they are generic.

The court erred. None of the three items of A&F's trade dress at issue in this case is generic. The label of "generic" is a severe condemnation and, we suspect, one that stings a clothing designer rather harshly. Here, the label is not justified. In language repeatedly quoted by the Supreme Court, Judge Friendly described generic terms as the genus of which a product is a species, *e.g.*, "soap" or "shirts" or "baseball caps." The equivalent in designs, bearing in mind the word-mark policy that a manufacturer has the right to call a product by its name, would be the most basic incarnation of a given genus of products, *i.e.*, the image that appears in a person's head when he hears the word "shirt" or "baseball cap." Clothing bearing images of athletic paraphernalia are not a basic incarnation of certain types of apparel. The genus is athletic (or suggestively athletic) apparel; the species is shirts bearing lacrosse sticks. With respect to the Quarterly, the genus is "mail-order clothing catalogs"; the species is mail order clothing catalogs containing lifestyle editorial content and depicting the goods in the "clothesline" style with color bars to present color options. Just as a manufacturer has a right to call a product by its name, it can sell its clothes by mail by placing images of them in a catalog, but it need not do so in the manner of another producer. While producers have little choice but to call a shirt a shirt, they can place upon a shirt an infinite variety of images and depict that shirt on paper in an infinite variety of ways. That certain of these ways are particularly effective at generating sales does not make them generic.

Since none of the trade dress at issue here is generic, Abercrombie can meet the distinctiveness requirement by showing attachment of secondary meaning to its designs. *See Samara Bros.*, 529 U.S. at 211 (describing caselaw on secondary meaning and citing the parallel principle of Lanham Act section 2(f), 15 U.S.C. § 1052(f), that, with limited exceptions, "'nothing in this chapter shall prevent the

Reading the complaint in its most reasonable form,[8] this case involves garments made of certain fabrics containing certain design motifs drawn from certain color palettes and displaying certain registered trademarks and other design elements in a certain way. In addition, the Quarterly is an item containing a specific method of presenting products in conjunction with an identifiable photographic motif and editorial content addressing a lifestyle consistent with— perhaps spawning a lifestyle emulative of— the image Abercrombie intentionally associates with its clothing.[9] We regard the configuration of the catalog as trade dress because the Quarterly is a freestanding product that has its own trade

[8] Federal Rule of Civil Procedure 8(f) states that "All pleadings shall be so construed as to do justice." "As this court has stated, 'the fundamental tenor of the Rules is one of liberality rather than technicality . . . .'" *Minger v. Green*, 239 F.3d 793, 799 (6th Cir. 2000) (citing *Miller v. American Heavy Lift Shipping*, 231 F.3d 242, 248 (6th Cir. 2000)). When doing so results in no prejudice to the opposing party, discarding labels in an inartfully drafted complaint in favor of the complaint's reasonable meaning, "[e]ven where such a label reflects a flat misapprehension by counsel respecting a claim's legal basis," *Labram v. Havel*, 43 F.3d 918, 920 (4th Cir. 1995), comports with the Federal Rules' intent and serves the ends of justice. *See Minger*, 239 F.3d at 799.

[9] In discussing the protectability of the Quarterly, we must be careful not to over-read language in previous cases describing trade dress as a product's "image." *See, e.g., Ashley Furniture Indus., Inc.*, 187 F.3d at 373 (describing trade dress as the "total image" of a product); *Ferrari*, 944 F.2d at 1238-39 (stating that trade dress refers to "the image and overall appearance of a product"). While the Abercrombie & Fitch Quarterly undoubtedly conveys an "image" of healthy, attractive, active young people engaged in a variety of recreational activities while wearing (or often not wearing) Abercrombie clothes, we must not lose sight of this case as a trade dress action and therefore do not mean to suggest that Abercrombie can acquire a monopoly on being "cool" or "hip" in a certain manner. The "image" referred to by previous cases is visual, *e.g.*, the shape of a Ferrari Daytona, rather than conceptual, *e.g.*, a *notion* of unimpeded swiftness associated with an aerodynamic auto body design or a *notion* of "coolness," trendiness, or "hipness" predominant in the *zeitgeist*. Again, to constitute trade dress, a "thing" must be objectively observable by the senses.

dress, an objectively observable "particular sales technique" used to sell clothing, or packaging of the products it depicts.[10] Abercrombie's use of certain in-store displays and a sales associate team comprised mainly of college students also constitute a "particular sales technique."

Thus, in remarking that Abercrombie sought protection only of its marketing theme, the district court misconstrued the nature of this suit. Abercrombie sought protection of its trade dress, which includes features of— and, in the case of the Quarterly, also comprises a major part of— Abercrombie's marketing campaign. Yet A&F's claimed trade dress transcends those aspects of its trade dress directly associated with its campaign to attract young, fit, active consumers. As we read the complaint, the trade dress A&F

---

[10] Abercrombie can seek protection of its Quarterly because Abercrombie closely associates in time and space— as indicated by the Quarterly's sales-related content and its display in Abercrombie stores— the visual images contained in the Quarterly with its products. As promotional material closely associated with its products in the same way that product packaging either containing visual images or conveying an ephemeral image is closely associated with the product its contains, the design of the Quarterly can properly be regarded as a component of the trade dress of Abercrombie's clothing insofar as it constitutes a particular sales technique, *Original Appalachian Artworks*, 684 F.2d at 831, or "some *tertium quid* that is akin to product packaging" that would normally be taken by consumers as an indication of source, *see Samara Bros.*, 529 U.S. at 215.   Alternatively, Abercrombie has introduced evidence showing that the Quarterly itself is a product that Abercrombie sells, and as such may be independently entitled to trade dress protection of its design. *See Reader's Digest Assoc., Inc. v. Conservative Digest, Inc.*, 821 F.2d 800, 803-05 (D.C. Cir. 1987) (protecting as trade dress the cover design, in terms of size, shape, and graphic layout, of *Reader's Digest* magazine). Because the only trade-dress-law difference between product packaging and product configuration is the availability to product packaging of the inherent distinctiveness route to legal distinctiveness, *see infra* pages 25-26, and this case involves secondary meaning allegedly having attached to the catalog, we need not decide whether the catalog is a product, a package, or some tertium quid. *See Tools USA & Equip.*, 87 F.3d at 657-59 (not addressing whether a tools catalog is a product or a package, because a jury had found secondary meaning).

---

principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining" protectability under § 43(a), and it made specific reference to the *Abercrombie* test and the unregistrabilty of generic marks.[13]   Thus *Samara Brothers* leaves in place the rule that generic product configurations are not protectable as trade dress under § 43(a).  To summarize, then, only non-generic product configurations that have acquired distinctiveness through attachment of secondary meaning satisfy the distinctiveness requirement of the Lanham Act.

The district court examined the features of Abercrombie's catalog listed in the complaint and declared them, oddly, "both generic and descriptive." The court then viewed the catalog as a whole to determine if its overall appearance created a "unique look that is protectable," and held that "there is nothing arbitrary or fanciful, *or in any way distinctive*, about the combination of these elements in a clothing catalog that would make the whole of the 'Abercrombie Brand,' at least as it relates to the descriptive language, color combinations, and cutout style, something more than the sum of its non-protectable parts.   That observation applies equally to the use of words claiming that the clothing is 'authentic' and the use of A&F's own trademark . . . ." *Ibid.* (emphasis added).  This appears to be a holding that Abercrombie's clothing designs and its catalog

---

be regarded as a standard men's shirt, and the public would have no occasion to regard a garment of such basic design as coming from a certain shirtmaker, for the design is a generic one and does not distinguish the good.

[13] *See also* 15 U.S.C. § 1064(c) (providing for cancellation of any mark that has become "the common descriptive name of an article or substance," *i.e.*, a generic term); *Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d 366, 374 (1st Cir. 1980) ("No amount of purported proof that a generic term has acquired a secondary meaning associating it with a particular producer can transform that term into a registrable trademark.").

showing of inherent distinctiveness but must rely instead on acquired distinctiveness, *i.e.*, a showing of secondary meaning. *See id.* at 216. Still, *Samara Brothers* did not completely eschew the *Abercrombie* taxonomy for analyzing distinctiveness. Indeed *Samara Brothers*, like *Qualitex*, reasoned by analogy to Judge Friendly's classifications of word marks, particularly relying on the rationales underlying the classifications. In adapting those rationales to product configuration trade dress, the Court determined that the more distinctive categories of word marks had no parallel in the field of design and required all purportedly distinctive designs to have acquired secondary meaning before becoming eligible for protection. The Court did not address the ability of generic designs to distinguish goods as the product of a particular supplier, leaving open the conceptual possibility that generic designs bearing secondary meaning are protectable. For purposes of classifying word marks, "[a] generic term is one that refers, or has come to be understood as referring, to the genus of which the particular product is a species." *Abercrombie & Fitch*, 537 F.2d at 9. On the unprotectability of generic marks, Judge Friendly explained: "No matter how much money and effort the user of a generic term has poured into promoting the sale of its merchandise and what success it has achieved in securing public identification, it cannot deprive competing manufacturers of the product of the right to call an article by its name." *Ibid.*

This reasoning applies equally well to generic product configurations, for no designer should have a monopoly on designs regarded by the public as the basic form of a particular item.[12] *Two Pesos* commented that the "general

---

[12]An anachronism demonstrates the point: an ancient Roman designer who conceived and marketed a new tunic by having it fit the body snugly with sleeves down to the wrist slit at mid-forearm on the underside, a simple cuff for buttoning, buttons spaced evenly down the front, and a stiff folding collar with splayed points might have deserved trade dress protection of his innovative design if consumers viewed the products as coming from a single source, but the same design today would

seeks to protect is: 1) the designs of the goods themselves, 2) the design of the catalog created to sell its products by, among other things, cultivating an image it wants consumers to associate with its products, and 3) features of its in-store presentation associated with the sale of its products.[11]

---

[11]American complains that "Abercrombie's purported trade dress is an ever changing melange of words, logos, and colors; elements are added and dropped with every season and every change in what is currently 'cool' to the college-age consumer." Appellee's Br. at 24-25. Furthermore, American points out that Abercrombie does not consistently use its claimed trade dress in all of its products. American argues that "[i]t is therefore ludicrous to assert that Abercrombie trade dress, which 'represent[s] a kaleidoscope of color combinations and design formats which fail to convey a consistent overall look' to consumers [is as precise as Taco Cabana trade dress]" Appellee's Br. at 25 (quoting *Rose Art Indus., Inc. v. Raymond Geddes & Co.*, 31 F. Supp. 2d 367, 376 (D.N.J. 1998)). Finally, American observes that Abercrombie's complaint identifies as trade dress only nine of the many elements it uses in packaging, labeling, and presenting for sale its products, while Abercrombie sells thousands of items bearing designs not mentioned in its complaint (*e.g.*, designs including the terms "water rescue," "lifeguard," and "guard," and images of basketballs), and American sells thousands of items that include design elements unrelated to those claimed to be Abercrombie's trade dress.

American's argument posits that trade dress encompassing multiple products must be uniform and consistent over time and across products. This point certainly applies to the trade dress of a family of products. *See Regal Jewelry Co. v. Kingsbridge Int'l, Inc.*, 999 F. Supp. 477, 486 (S.D.N.Y. 1998); *see also Rose Art Indus., Inc.*, 31 F. Supp. 2d at 373 ("[A] party may have trade dress rights even though there are slight variations in its package design so long as the change does not alter the distinctive characteristics and the trade dress conveys a single and continuing commercial expression."). Yet Abercrombie does not seek trade dress protection of its designs and advertising materials under a "family of marks" or a "family of dresses" theory. Instead, A&F's theory proceeds from its claim that consumers recognize secondary meaning in its various designs that are similar in terms of their style but so dissimilar in terms of their content that the "family of dresses" theory is not available. We see no reason why a single producer cannot seek protection of dissimilar forms of its trade dress as long as each form independently meets the two conditions of protectability. *Accord* MCCARTHY ON TRADEMARKS § 8:2 ("While trade dress is most often defined as a totality of elements, there is no reason why the plaintiff cannot define a list of

This court's willingness to read a complaint fairly should not be taken as an invitation to shotgun litigation, especially when a producer claims that a combination of elements comprises its trade dress. As McCarthy commented, "[w]hatever may be claimed as the combination of elements making up the product or its packaging and presentation, . . . it will not do to solely identify in litigation a combination as 'the trade dress.' Rather, the discrete elements which make up that combination should be separated out and identified in a list." MCCARTHY ON TRADEMARKS § 8:3. As the Second Circuit observed,

> focus on the overall look of a product does not permit a plaintiff to dispense with an articulation of the specific elements which comprise its distinct dress. Without such a precise expression of the character and scope of the claimed trade dress, litigation will be difficult, as courts will be unable to evaluate how unique and unexpected the design elements are in the relevant market. Courts will also be unable to shape narrowly-tailored relief if they do not know what distinctive combination of ingredients deserves protection. Moreover, a plaintiff's inability to explain to a court exactly which aspects of its product design(s) merit protection may indicate that its claim is pitched at an improper level of generality, i.e., the claimant seeks protection for an unprotectable style, theme or idea.

---

elements consisting of less than the totality of features."). This result reflects the reality of the clothing industry, since including "lifeguard" and lacrosse sticks in designs of clothing sold for summer and putting "ski patrol" and the ski patrol cross on clothing sold for winter is simply a reaction to seasonal changes, not a rejection of one form of design trade dress in favor of another. *Cf. Samara Bros., Inc. v. Wal-Mart Stores, Inc.*, 165 F.3d 120, 126 (2d Cir. 1998) ("We expect that in a product line there will be inevitable variation in the products."), *rev'd on other grounds*, 529 U.S. 205 (2000).

the *Duraco Products* court treated restaurant decor as akin to product packaging and arguing that product configuration is a better parallel; under a unified approach, of course, the distinction would not make a difference).

The Supreme Court appears to have settled the dispute by agreeing in large part with the Third Circuit. The Court regarded *Qualitex* as following the rationale behind the *Abercrombie* test but not adopting it outright, because color, like a descriptive word mark, does not "almost *automatically* tell a customer that [it] refers to a brand," and does not "immediately signal a brand or a product source," although it may come to have such powers upon acquisition of secondary meaning. *Samara Bros.*, 529 U.S. at 212-13 (internal citations and quotations omitted). The Court held that a product's design cannot be inherently distinctive because, "as in the case of color, . . . consumer predisposition to equate the feature with the source does not exist." *Ibid.* The Court specifically condemned any attempt to craft a "reasonably clear test" for inherent distinctiveness of a product's design. *Id.* at 213-14 (refusing to adopt the *Seabrook Foods* test and implicitly rejecting the *Duraco Products* test). The Court explained that *Two Pesos* stands for the proposition that trade dress can be inherently distinctive, "but it does not establish that product-design trade dress can be." Again relying on the rationale underlying the *Abercrombie* classifications, the Court determined that the trade dress at issue in *Two Pesos* was either product packaging, which "normally is taken by the consumer to indicate origin," or some "tertium quid . . . akin to product packing." *Id.* at 215. The Court's reasoning thus relies on the notion that a product's configuration— unlike its packaging— is inextricably tied to the product itself, such that even the most unusual features of a product's design cannot automatically identify which producer crafted the product because consumers are not predisposed to treat design features as an indication of source.

After *Samara Brothers*, no product configuration can meet the distinctiveness requirement of the Lanham Act by a

996, 1007 (2d Cir. 1995), and "does not quite fit the . . . considerations applicable to product configurations," *Duraco Prods., Inc. v. Joy Plastic Enters.*, 40 F.3d 1431, 1441 (3d Cir. 1994). Those courts regarded the design of a product as inextricably tied to the product's nature or its appeal to consumers, meaning that the design of a product cannot form one of the dialectical relationships to the product identified in *Abercrombie*. *See, e.g., id.* at 1440-41 ("the product's configuration cannot be said to be 'suggestive' or 'descriptive' of the product, or 'arbitrary' or 'fanciful' in relation to it"). The *Duraco Products* court plumbed the rationales underlying the *Abercrombie* classifications and *Two Pesos*'s recognition that at least some trade dress can be inherently distinctive in order to craft a three-part test for identifying inherently distinctive product configurations. *See id.* at 1448-49 (requiring the product configuration to be i) unusual and memorable, ii) conceptually separable from the product, and iii) likely to serve primarily as a designator of the product's origin); *see also Knitwaves*, 71 F.3d at 1008 (adopting the "likely to serve primarily as a designator of origin of the product" requirement).

The Eighth Circuit disagreed with the *Duraco Products* court's focus on the consumer's perception of the product (in terms of the configuration's memorableness and capacity for source-identification) and stood by the *Abercrombie* classifications as a workable device for determining "whether and to what degree that feature is dictated by the nature of the product." *Stuart Hall Co. v. Ampad Corp.*, 51 F.3d 780, 785-88 (8th Cir. 1995) (reasoning from Fifth Circuit cases cited with approval by *Two Pesos* and the test developed in *Seabrook Foods, Inc. v. Bar-Well Foods, Ltd.*, 568 F.2d 1342, 1344 (C.C.P.A. 1977)). The *Stuart Hall* court expressed concern that a source-identification or memorableness requirement too closely resembled the standard for secondary meaning, and emphasized that courts should not treat product packaging and product configuration cases differently, in part because determining which category certain trade dress falls into can be difficult. *See* 51 F.3d at 787-88 (exploring why

*Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 381 (2d Cir. 1997).

The *Landscape Forms* court reversed issuance of a preliminary injunction because "Landscape ha[d] not articulated and supported its claimed [inherently distinctive] trade dress with sufficient particularity." *Landscape Forms*, 113 F.3d at 381. While the language of Abercrombie's complaint rides the cusp of sufficient particularity, with its occasional overbreadth leaving some claims devoid of meaning, A&F attached to its complaint photographic depictions of designs it claimed constituted its trade dress and the record now contains volumes of photographic exhibits depicting its garment designs and the design of its Quarterly. A complaint is neither an injunction nor a judgment; it merely puts the defendant on notice of the plaintiff's claims. At the time of American's summary judgment motion, Abercrombie had not yet sought to enjoin American from using any designs. Had the case proceeded further, Abercrombie would have been expected to list the elements of the designs and the unique combinations it sought to protect, which enumeration would have enabled the district court to craft a sufficiently specific injunction had such proved warranted. *See Samara Bros.*, 165 F.3d at 126 & n.2 (distinguishing *Landscape Forms* by recognizing the complaint's insufficient description of the distinctive aspects of the garment designs but refusing to "look at the complaint in a vacuum," and finding "that the evidence adduced at trial sufficiently depict[ed] the 'distinctive combination of ingredients' in Samara's trade dress"), *rev'd on other grounds*, 529 U.S. 205 (2000).

The district court erred in treating Abercrombie's suit as an attempt to protect a "marketing theme." A&F seeks protection of its designs, and it can do so even if the designs are consistent with, contain aspects of, form a part of, or convey to consumers the same message as, its marketing campaign. In sum, the three "things" Abercrombie seeks to protect constitute trade dress.

## C

The first step in qualifying trade dress for protection under § 43(a) is proving distinctiveness. "[C]ourts have universally imposed th[is] requirement, since without distinctiveness the trade dress would not 'cause confusion . . . as to the origin, sponsorship, or approval of [the] goods,' as [section 43(a)] requires." *Samara Bros.*, 529 U.S. at 210. For purposes of the Lanham Act, distinctiveness comes in two forms, either one of which satisfies the distinctiveness condition of protectability. *See Two Pesos*, 505 U.S. at 769. A mark or dress can be inherently distinctive if its "intrinsic nature serves to identify a particular source." A non-inherently distinctive mark or dress can have acquired distinctiveness through attachment of secondary meaning, which occurs when, "in the minds of the public, the primary significance of a [mark or dress] is to identify the source of the product rather than the product itself." *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n.11 (1982). Judge Friendly formulated a "now-classic test," *Samara Bros.*, 529 U.S. at 210, to conceptualize distinctiveness. The so-called *Abercrombie & Fitch* taxonomy deems word marks inherently distinctive when they are arbitrary ("Lucky Strike" cigarettes), fanciful ("Kodak" film), or suggestive ("Tide" laundry detergent). *See Abercrombie & Fitch Co.*, 537 F.2d at 10-11. By contrast, descriptive ("Soft Soap") or generic ("soap") terms do not inherently distinguish a good as coming from a particular source. *See ibid.* Context is important in distinguishing among categories: whereas an air conditioning company placing a penguin on its products has selected a suggestive mark, a publishing company with the same logo has an arbitrary mark. *See Ashley Furniture Indus.*, 187 F.3d at 369. While not inherently distinctive, descriptive marks can identify a source and acquire distinctiveness if secondary meaning has attached to the term, such that consumers recognize "Soft Soap" as a product of a certain manufacturer. *See Two Pesos*, 505 U.S. at 774 (explaining 15 U.S.C. § 1052). "Generic marks— those that 'refe[r] to the genus of

which the particular product is a species'— are not registrable as trademarks." *Id*. at 768.

The Supreme Court remarked that "the general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a)." *Two Pesos*, 505 U.S. at 768. *Two Pesos* resolved a circuit split by bringing § 43(a) trade dress jurisprudence into accord with the law of word marks because § 43(a) contained no statutory language directing that trade dress be treated differently. The Court specifically approved of using the *Abercrombie* classifications for distinguishing inherently distinctive marks from descriptive and generic marks. *See id*. at 773 (holding that a restaurant configuration can be inherently distinctive). Three years later, the Court drew much the same parallel: it treated color as not fanciful, arbitrary, or suggestive of a product but still something akin to being descriptive of it, in the sense that color can come to identify and distinguish goods just as descriptive words can acquire distinctiveness through secondary meaning. *See Qualitex*, 514 U.S. at 162-63 (also noting that an infinite variety of things qualify as a "symbol" or "device," 15 U.S.C. § 1127, including the shape of a Coca-Cola bottle, the sound of NBC's three chimes, and the scent of plumeria blossoms on sewing thread).

In the ensuing years, the circuit courts split over whether and to what extent the *Abercrombie* taxonomy applied to product configuration trade dress cases, although most agreed that product packaging trade dress cases should be analyzed under that framework. *See* Rohit A. Sabnis, *Product Configuration Trade Dress and* Abercrombie*: Analysis of* Ashley Furniture Industries, Inc. v. Sangiacomo N.A. Ltd., 1 Minn. Intell. Prop. Rev. 183, 193 (2000).

The Second and Third Circuits submitted that the *Abercrombie* taxonomy "make[s] little sense when applied to product features," *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d