**NOT RECOMMENDED FOR PUBLICATION**
File Name: 14a0604n.06

Nos. 13-3587/4049/4130

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Aug 07, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| PREMIUM BALLOON ACCESSORIES, INC. | ) | |
| | ) | |
| Plaintiff-Appellee (13-3587), | ) | |
| | ) | |
| Plaintiff-Appellant/Cross-Appellee | ) | |
| (13-4049, 13-4130), | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| | ) | NORTHERN DISTRICT OF OHIO |
| CREATIVE BALLOONS MFG., INC., | ) | |
| | ) | |
| Defendant-Appellant (13-3587), | ) | |
| | ) | |
| Defendant-Appellee/Cross-Appellant | ) | |
| (13-4049, 13-4130). | ) | |

Before: BOGGS, COLE, and McKEAGUE, Circuit Judges.

BOGGS, Circuit Judge. Premium Balloon Accessories, Inc. ("Premium") and Creative Balloon Manufacturing, Inc. ("Creative") make balloon accessories, including balloon weights, which are objects that weigh down helium balloons so that they don't fly away.

In 1999, Premium sued Creative, alleging that Creative's balloon weights infringed Premium's trade-dress rights in four of its balloon weights, including a star-shaped weight. The parties entered into a settlement agreement on June 21, 2000, under which Creative agreed to pay Premium for "a fully paid-up license under the trade dress that was the subject of the Complaint." Soon after the agreement was signed, Premium began manufacturing a new star-

shaped "Heavy Weight" balloon weight, which was similar in appearance to the star-shaped weight that it already sold except that it was thicker and heavier. In 2009, Creative introduced a similar weight to the market, calling it the "SuperStar" balloon weight.

Premium then filed this lawsuit against Creative for infringing the trade dress of its star-shaped Heavy Weight. Creative argued that it had a license to use Premium's design under the previous settlement agreement between the parties, and that, in any event, Premium had not acquired trade-dress rights in the use of that design. Creative also asserted its own claims against Premium for infringement of Creative's patented balloon-sealing device.

The parties filed cross-motions for summary judgment. The district court held that the trade-dress license that Creative had acquired under the settlement agreement did not extend to Premium's new, heavier star-shaped weight. The court further held that the design of Premium's new weight was neither "generic" nor "functional," and that the design had acquired "secondary meaning" in the marketplace. The court concluded that Creative's SuperStar weight infringed Premium's trade-dress rights in its star-shaped Heavy Weight. The court enjoined Creative from continuing to sell the SuperStar, awarded Premium damages in the amount of Creative's profits on the sale of the SuperStar ($23,693), and denied Premium damages for price erosion. With respect to Creative's infringement claims concerning the balloon-sealing device, which claims Creative voluntarily dismissed, the district court awarded Premium $10,000 in attorney's fees after finding that Creative's claims were "exceptional" in their "groundless[ness]."

In appeal No. 13-3587, Creative argues that the district court erred in finding that Creative's trade-dress license under the settlement agreement was limited to the four products that it was selling at the time of the agreement. Creative also asserts various other arguments, including that Premium never adequately defined its Heavy Weight trade dress, that the trade

2

dress is generic and functional, and that Premium failed to demonstrate that the trade dress had acquired distinctiveness and that Creative's SuperStar was likely to cause confusion. In a separate appeal and cross-appeal, Nos. 13-4049 and 13-4130, Premium argues that the district court erred in failing to award damages for price erosion, and Creative argues that the district court erred in admitting certain evidence of damages, awarding damages in the absence of a finding that Creative acted willfully, and awarding Premium attorney's fees incurred in defending against Creative's infringement claims. We consolidated the three appeals.

For the reasons explained in detail in this opinion, each of the district-court conclusions cited above was error. First, Creative had a right to produce the SuperStar weight under the terms of the settlement agreement. The agreement gave Creative a license to use Premium's trade dress in certain of its balloon weights, including its lighter star-shaped weight, and nowhere did the agreement limit the scope of that license to the products that either party was already making at the time. The star-shaped Heavy Weight uses essentially the same trade dress as the star-shaped weight that forms the basis of Creative's license, albeit with minor, primarily functional modifications (e.g. for size and weight). Those modifications, standing alone, are insufficient to give Premium trade-dress rights independent of and in addition to whatever rights it may have acquired in the original star-shaped-balloon-weight trade dress.

Second, the district court erred in holding that Premium's star-shaped Heavy Weight design was "descriptive" rather than "generic," was not "functional," and had acquired "secondary meaning" in the marketplace—all findings that were necessary for Premium to have acquired protectable rights in its design. On the first point, the district court erroneously attempted to categorize *product-design* trade dress in the way that it would characterize a *mark* as "generic," "descriptive," "arbitrary," or "fanciful." On the second point, the court should have

3

considered the extent to which aesthetic characteristics, such as the weight's shape, might serve a "functional" purpose under certain circumstances. And most significantly, the court erred when it relied on the traditional test for whether a *mark* has acquired distinctiveness and applied that test to *product-design* trade dress in a manner that did not make sense.

Lastly, though a closer call, the district court erred in awarding attorney's fees to Premium for defending against Creative's infringement claims. Although Creative's claims admittedly lacked merit, they were not so exceptional in their groundlessness as to warrant that extraordinary sanction.

## I

We turn first to Creative's claim that it had a license to manufacture the SuperStar weight under the previous settlement agreement between the parties.

"A settlement agreement is a type of contract and is therefore governed by contract law." *Neely v. Good Samaritan Hosp.*, 345 F. App'x 39, 43 (6th Cir. 2009). "Questions of contract interpretation are generally considered questions of law subject to *de novo* review." *Ibid.*

The two-page settlement agreement reads, in pertinent part:

2. Upon receipt of the monies aforesaid, PBA [Premium] shall grant to Creative a fully paid-up license under the trade dress that was the subject of the Complaint in the pending litigation, namely 1) a star, 2) a circular smile face, 3) a heart, and 4) a teddy bear in primary and pastel colors, such license to continue so long as the quality of the products made by Creative is at least consistent with the quality of the products presently being made by Creative with such trade dress, and further provided that the appearance of the products made by Creative which were the subject of the pending litigation are not modified to be closer in appearance to the corresponding products of PBA than presently.

3. It is understood that PBA will occasionally obtain samples of Creative's products sold with the trade dress licensed hereunder . . .

5. The parties, as licensor and licensee of the subject trade dress, agree to henceforth compete fairly with each other in the marketplace.

4

The agreement thus gives Creative a "license under the trade dress that was the subject of the Complaint in the pending litigation," which included the star-shaped-weight trade dress. The agreement does not limit the nature and scope of that license—for example, it does not clarify that it is a license to use the trade dress for certain purposes or products but not others. As a result, the plain meaning of the agreement is that it is a license to use the trade dress, without limitation, provided Creative satisfies the other conditions stated in the agreement.

The district court held that "[t]he Settlement Agreement explicitly limits CBM's [Creative's] license to PBA's 'presently' corresponding products." Plainly, however, that is not what the agreement says. The agreement says that the trade-dress license shall "continue so long as the quality of the products made by Creative is at least consistent with the quality of the products presently being made by Creative with such trade dress." That language is about the quality of Creative's products, not the scope of its license. What it means is that if Creative started using Premium's trade dress in products of inferior quality, Creative would lose its license. The quoted language does *not* mean that the license was limited to then-existing products.

The district court concluded that "because neither party produced a star-shaped heavy balloon weight when the 1999 lawsuit was filed and settled, the *star-shaped* heavy weights were not a part of the 1999 Complaint or the related Settlement Agreement." Again, however, the district court misunderstands the nature of the agreement and the license granted thereunder. The agreement does not grant a license to make certain products; it grants a license to use certain trade dress, including the trade dress of the star-shaped weight that Premium was producing at the time.

5

The question, then, is whether Creative's SuperStar weight uses the trade dress of Premium's original, lighter star-shaped weight (Premium's star-shaped "Designer Weight"). If so, Creative had a license to use that trade dress.

"Trademarks and trade dress are separate and distinct causes of action under the Lanham Act." *Gen. Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 414 (6th Cir. 2006) (citations omitted). "Trade dress refers to the image and overall appearance of a product. It embodies that arrangement of identifying characteristics or decorations connected with a product, whether by packaging or otherwise, that makes the source of the product distinguishable from another and promotes its sale.'" *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 629 (6th Cir. 2002) (citations and quotation and alteration marks omitted). "Trade dress involves the total image of a product and may include features such as size, shape, color or color combinations, texture, graphics, or even particular sales techniques." *Ibid.* (citations and quotation marks omitted).

In its 1999 complaint, Premium alleged, in pertinent part:

5. [Premium's] Designer Balloon Weights were introduced and continuously marketed by PBA with four unique configurations: 1) a star, 2) a smile face, 3) a heart and 4) a teddy bear. Balloon weights in these configurations were unique to the balloon industry and the configurations were totally arbitrary and fanciful and unrelated to the function performed by the weight – tethering a balloon. Premium markets and sells the Designer Balloon Weights in two color assortments – primary and pastel.

. . .

7. In about 1996, PBA introduced a weight of greater mass than its Designer Weights to meet specific needs in the market. That weight, sold under the mark "Premium Heavy Weight," adopted the smile face and heart configurations of the Designer Weights, consistent with the trade dress of the Designer Weights.

8. Since about June 1998, Creative has entered the balloon market with balloon weights which are substantially identical to those of PBA in size, weight and appearance and, in doing so, has adopted has adopted a substantially identical trade dress and product configuration, including the same color assortments of primary and pastel colors.

6

Creative advertises and distributes its balloon weights under the designation "Happy Weights" throughout the United States and within this district . . .

9. Recently, and upon information and belief, Creative has introduced weights substantially identical to the Premium Heavy Weight balloon weights of PBA, adopting the same trade dress for those identical products, the same color theme, and the confusingly similar mark "Heavy Weight."

Thus, in its 1999 complaint, Premium alleged that Creative was using Premium's Designer Weight trade dress, and further alleged that its Heavy Weights—which at the time did not yet include the star—used the same trade dress.

Again, the question is whether Creative's SuperStar uses the trade dress of Premium's star-shaped Designer Weight. And the basic answer is yes. Premium's trade-dress claim hinged primarily on the "unique configurations" of its balloon weights, including its star weight, which Premium claimed were "arbitrary and fanciful and unrelated to the function performed by the weight – tethering a balloon." Premium objected that the "size, weight and appearance" of Creative's weights reflected a "substantially identical trade dress and product configuration, including the same color assortments of primary and pastel colors." Creative's SuperStar weight appears to have the same "unique configuration" as the original star weight—it appears to have an identical shape, its sides are of an identical length, and like the original weight, it has a raised border and a small round hook at the top. It also appears to come in a similar set of colors. Although the thickness and weight of the SuperStar star are, as one might expect, different from the thickness and weight of the original, lighter star weights, these differences do not change the fact that the dress of Creative's SuperStar weight and Premium's original star weight are identical in their critical aspects. Indeed, Premium's own complaint back in 1999 appears to have distinguished its "unique" and "fanciful" "configuration" from the balloon weight's weight—a characteristic inherent in "the function performed by the weight – tethering a

7

balloon." In addition, Premium claimed that the trade dress of its thicker and heavier Heavy Weights was "consistent with the trade dress of the Designer Weights." In other words, apparently Premium did not consider the trade dress of the Heavy Weights to be materially different from that of the Designer Weights. It follows that Premium does not appear to have considered the weights' thickness and weight to be an essential part of its trade dress. And even if it did, Premium's license to Creative arguably included the right to produce thicker and heavier weights, since two of the weights in the litigation pending in 1999 *were* the thicker and heavier versions of the lighter weights.

A review of Premium's brief on appeal supports the view that Creative's SuperStar uses essentially the same trade dress as Premium's star-shaped Designer Weight, which Creative was licensed to use. In its brief on appeal, Premium claims that its star-shaped Heavy Weight "is of a particular mass, has a particular five-point star configuration or shape, follows a particular primary color scheme, and has a smooth plastic texture but for an outer raised edge or border." Appellant's Br. at 4 (No. 13-3587; all references are to the briefs in this appeal unless indicated otherwise). Further, Premium emphasizes "the consistency in the overall appearance" of Premium's star-shaped Heavy Weight "with Premium's other balloon weights as to primary color scheme, texture, and raised edge or border." *Ibid.* Premium's star-shaped Designer Weight—the trade dress of which, again, Creative was licensed to use—is identical to Premium's Heavy Weight along all of these dimensions except for mass—the one indisputably functional dimension. That is, the two weights have the same "five-point star configuration or shape," the same "primary color scheme," and the same "smooth plastic texture but for an outer raised edge or border." In other words, the trade dress of the Heavy Weight is essentially the

same as the trade dress of the Designer Weight. Because Creative had a license to use the Designer Weight trade dress, it had a license to produce the SuperStar using that trade dress.

The settlement agreement gave Creative a license to use the trade dress of Premium's star-shaped Designer Weight, and Creative's manufacture and sale of its SuperStar weight are a valid exercise of Creative's rights under that license.

## II

This case would warrant reversal even if Creative's license did not cover the SuperStar. As mentioned, to grant Premium summary judgment on its infringement claim, the district court first had to conclude—and did conclude—that Premium had acquired trade-dress rights in its design. The district court so held after determining that Premium's star-shaped Heavy Weight design a) was "descriptive" rather than "generic," b) was not "functional," and c) had acquired "secondary meaning" in the marketplace. Because it may not be appropriate to characterize product *design* as "generic," "descriptive," or otherwise, in the way that one might characterize a *mark*, it is unclear whether the district court's first determination was necessary. But it is clear that the other two determinations—that the design was not functional and that it had acquired secondary meaning—were necessary to its conclusion that Premium had acquired protectable rights in its design. Each of those determinations was erroneous. Reversal is thus appropriate for that reason as well.

## A

As a preliminary matter, Creative first argues that Premium "never properly defined the distinct elements of its trade dress as required by Sixth Circuit precedent." Appellant's Br. at 30. We reject this argument. Premium's description of its trade dress in the star-shaped Heavy Weight was sufficiently definite to enable the parties to litigate and the district court to rule on

9

the trade-dress claim. In particular, Premium provided pictorial representations of its trade dress and emphasized the weight (80–100 grams), shape (five-pointed star), colors (primary), and size of its weight, among other factors. Although Premium's articulation of its trade dress could have been more precise—for example, Premium should have stated the size of its weight—Creative cites no law for its apparent argument that Premium's description was too indefinite to state a valid claim. Although a relatively broad and vague characterization of one's trade dress might render such dress generic or otherwise ineligible for protection, it does not render one's claim ineligible for consideration in the first instance.

**B**

Creative next argues that the trade dress of Premium's star-shaped Heavy Weight is generic. "[G]eneric product configurations are not protectable as trade dress under § 43(a)" of the Lanham Act. *Abercrombie*, 280 F.3d at 638. After all, "no designer should have a monopoly on designs regarded by the public as the basic form of a particular item." *Ibid.* In practice, it is difficult to distinguish between generic and "descriptive" *designs*, as opposed to marks. Indeed, as the Second Circuit has explained, classifying product designs in this way is not practicable or useful. *Knitwaves, Inc. v. Lollytogs Ltd. (Inc.)*, 71 F.3d 996, 1007 (2d Cir. 1995) ("Not only does the classification of marks into 'generic,' 'descriptive,' 'suggestive,' or 'arbitrary or fanciful' make little sense when applied to product features, but it would have the unwelcome, and likely unintended, result of treating a class of product features as 'inherently distinctive,' and thus eligible for trade dress protection, even though they were never intended to serve a source-identifying function.").

Here, the district court found that "the relevant genus is balloon heavy weights. The star-shaped heavy weight is not a species of PBA's balloon weights; but rather, a descriptor, a

desirable characteristic of that particular balloon heavy weight," which renders the weight "eligible for trademark protections." It is unclear why that is so. That is, it is unclear why the genus is "balloon heavy weights" as opposed to "balloon weights" as opposed to "weights" as opposed to "star-shaped balloon heavy weights," and it is also unclear why "star-shaped" isn't a kind (or "species") of balloon weight—indeed, the evidence in the record demonstrated that many star-shaped balloon weights exist, and they are typically used to weigh down balloons with stars on them.

The district court's conclusion that Premium's design was distinctive appears to be at odds with the Supreme Court's discussion of this issue. The Supreme Court has emphasized "that design, like color, is not inherently distinctive." *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 212 (2000). "The attribution of inherent distinctiveness to certain categories of word marks and product packaging derives from the fact that the very purpose of attaching a particular word to a product, or encasing it in a distinctive packaging, is most often to identify the source of the product." *Ibid.* The Court contrasted this with "*product-design* trade dress." *Ibid.* As the Court explained, "[c]onsumers are aware of the reality that, almost invariably, even the most unusual of product designs—such as a cocktail shaker shaped like a penguin—is intended not to identify the source, but to render the product itself more useful or more appealing." *Ibid.* As a result, the Court concluded: "We hold that, in an action for infringement of unregistered trade dress under § 43(a) of the Lanham Act, a product's design is distinctive, and therefore protectible, only upon a showing of secondary meaning." *Id.* at 216.

In light of the Court's holding, the question whether a design is "generic" seems to us misguided, since the thrust of its holding is that, on some level, nearly all designs are "generic" *ab initio*—even designs that may be innovative or unique—insofar as their purpose and effect is

11

generally not to communicate a given product's source. Furthermore, if a plaintiff can prove "secondary meaning"—as a plaintiff alleging infringement is required to do—it will almost invariably be the case that the design is not generic, for rarely are designs that consumers associate with a particular brand also generic. Therefore, it makes sense to answer the question of secondary meaning first, rather than the elusive question of generic design, because if a design has acquired secondary meaning in the marketplace, it is almost surely not generic, and if it has not, whether it is generic is irrelevant. As explained in Part II-D of this opinion, Premium failed to show that its design had acquired secondary meaning in the marketplace.

C

Creative next argues that Premium's trade dress is "functional." "[A] product feature is functional, and cannot serve as a trademark, if it is essential to the use or purpose of the article or if it affects the cost or quality of the article[;] that is, if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage." *Qualitex Co. v. Jacobson Prods. Co., Inc.*, 514 U.S. 159, 165 (1995) (citations and quotation marks omitted). "The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature. It is the province of patent law, not trademark law, to encourage invention by granting inventors a monopoly over new product designs or functions for a limited time." *Id.* at 164.

To the extent that Premium's trade dress consists of a star-shaped balloon weight of an approximate weight and size, in a star shape, and in primary colors, we agree that it is functional. As Creative explains, citing Premium's own promotional brochures, a relatively small size is necessary so the weight "does not detract from" the balloon. Appellant's Br. at 36. And the

correct weight is necessary so that it offsets the corresponding balloon the appropriate amount. The district court held that the balloon weight's design was not functional because "the 'star' shape is a merely incidental or ornamental aspect of the balloon weight." But the district court erred in concluding that the shape was therefore not functional. "[I]f a design's aesthetic value lies in its ability to confer a significant benefit that cannot practically be duplicated by the use of alternative designs, then the design is functional." *Qualitex Co.*, 514 U.S. at 170 (citations and quotation marks omitted). Here, Creative quite reasonably explained, and Premium does not appear to dispute, that "[a] star-shaped weight is offered as a 'match' to a star balloon." Appellant's Br. at 39. That is a significant benefit that other designs would not confer.

## D

Creative next argues that the district court erred in concluding that Premium's star-shaped Heavy Weight balloon weight had acquired secondary meaning. Again, we agree.

In general, in the absence of a patent or copyright, one manufacturer can copy the designs of another. *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29 (2001) ("Trade dress protection must subsist with the recognition that in many instances there is no prohibition against copying goods and products."). In order to acquire protectable trade-dress rights in one's design, one must show that the design has acquired a "secondary meaning" that "serves to identify the product with its manufacturer or source." *Id.* at 28. In other words, if consumers saw the star-shaped Heavy Weight and said, "Aha, that is a Premium weight," the design might be eligible for protection. If instead, they simply said, "Aha, that is a star-shaped heavy balloon weight, which is just the kind of weight I need," no trade-dress protection is available. It is in this latter way that consumers typically think about products like screws and doorknobs and curtains and, yes, to the extent consumers think about them at all, balloon weights. While that certainly does not

mean that the design of such products cannot acquire secondary meaning, it suggests that that is not the norm. As a result, Premium would appear to bear a significant burden in attempting to prove that its product-design trade dress has acquired secondary meaning in the marketplace.

"[A] product's configuration—unlike its packaging—is inextricably tied to the product itself, such that even the most unusual features of a product's design cannot automatically identify which producer crafted the product because consumers are not predisposed to treat design features as an indication of source." *Abercrombie*, 280 F.3d at 637 (explaining the Supreme Court's reasoning in *Samara Brothers*). As a result, "[a]fter *Samara Brothers*, no product configuration can meet the distinctiveness requirement of the Lanham Act by a showing of inherent distinctiveness but must rely instead on acquired distinctiveness, i.e., a showing of secondary meaning." *Ibid.* As with other trade dress, product-design trade dress acquires secondary meaning when its "primary significance . . . is to identify the source of the product." *Id.* at 635. The question is whether the product-design trade dress of Premium's star-shaped Heavy Weight balloon weight has acquired secondary meaning.

To determine whether a trade*mark* has acquired secondary meaning, we generally apply a seven-factor test. Those seven factors are: "(a) direct consumer testimony; (b) consumer surveys; (c) exclusivity, length, and manner of use; (d) amount and manner of advertising; (e) amount of sales and number of customers; (f) established place in the market; and (g) proof of intentional copying." *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 762 n.9 (6th Cir. 2005) (citations and quotation marks omitted). The district court applied this test in a robotic and at times incomprehensible fashion, found that the factors weighed in favor of Premium, and therefore concluded that Premium's star-shaped Heavy Weight had acquired secondary meaning. The court erred in the manner in which it applied this test and in the conclusion that it drew.

14

The seven-factor test is appropriate when applied to a *mark*, since the fundamental purpose of a mark is to identify the source of goods. Applying the aforementioned factors is a reasonable way to gauge whether a company has been successful in its attempts to associate a particular mark with its products in the mind of the public. But that is not necessarily the case when it comes to product *design*, since, as the Supreme Court has explained in no uncertain terms, "product design almost invariably serves purposes other than source identification." *Samara Brothers*, 529 U.S. at 213. As a result, selling many units of a product for a long period of time, advertising the product, and having a significant market share may give no indication as to whether one's product-design trade dress has "acquired secondary meaning"—that is, it may not indicate one way or the other whether the public associates a product's image with its source. Similarly, there is no—and there should be no—presumption of distinctiveness for the exclusive and continuous use for five years of a product *design*. Again, that makes sense for a mark, since the main, and possibly only, purpose of the mark is to create an association with the company in the minds of consumers. But that does not make sense for product design, because exclusive and continuous use of a particular design gives no indication as to whether the public in any way associates the "overall appearance" of a company's widgets with their source. On the other hand, consumer testimony and consumer surveys may be highly relevant, since they may directly answer the question whether consumers think of the company when they see a certain trade dress. A good example of a product whose design trade dress, at least at a certain level of specificity, has likely acquired secondary meaning is the iPod—many consumers see an iPod, with its distinctive four-button circular wheel with another button in the center, and think of Apple.

Here, Premium adduced no consumer-survey evidence to show that its trade dress has acquired secondary meaning, and the only evidence of consumer perception consisted of the belated declaration of Michael Isaacs, an executive at one of Premium's distributors, that "[t]he star-shaped Premium Heavy Weight™ balloon weight is frequently . . . requested by U.S. Balloon Co.'s customers by description including the features making up its overall appearance, such as size, weight or mass, configuration, material (i.e., smooth plastic) and colors." The district court concluded that Isaacs's "twenty-years [*sic*] of experience coupled with his declaration describing that U.S. Balloon Co.'s customers frequently request the star-shaped Premium Heavy Weight™ balloon weight by description raises [*sic*] an inference of secondary meaning, and no genuine issue as to any material fact is present as to this factor." In reality, Isaacs's statement proves nothing. It shows that customers want, and ask for, a star-shaped heavy balloon weight. It does *not* show that when customers see a star-shaped heavy balloon weight, they think, "Premium Balloon Accessories." Although Isaacs also stated that his customers "recognized" the weight "as coming from a single source," that otherwise unsupported conclusory claim is insufficient to indicate that Premium's Heavy Weight design had acquired secondary meaning.

The district court also found secondary meaning based on Premium's "exclusive and continuous use of its star-shaped Premium Heavy Weight™ balloon weight" for a period of five years. But again, while it may make sense to infer that a *mark* so used has acquired secondary meaning, it does not make sense to draw the same conclusion for a product design. Indeed, according such a presumption would give the first company to market for a given product the potential to acquire an exclusive on producing that product in perpetuity. As mentioned, protecting an invention is the province of patent law, not trademark law, and the court

fundamentally erred in finding that this factor indicates secondary meaning and "strongly favors" Premium.

Next, the district court found that the "amount and manner of advertising" favored a finding of secondary meaning. This finding is rather remarkable because Premium offered no evidence of any money spent on advertising its star-shaped Heavy Weight, and the sum total of its evidence for this factor appears to have been the fact that the product was included in its product brochures and displayed, source unnamed, among other products on the websites of Premium's distributors. In some cases, where a company spends a lot of money advertising or marketing a product with a particular design trade dress to the consumer public, the extent of such advertising may indicate that the design is likely to trigger an association with the company. Here, in the absence of any such advertising, there is no foundation for drawing an inference of secondary meaning.

Continuing with its analysis, the district court next found secondary meaning based on Premium's sales volume. Although the district court cited this court's observation that "sales volume . . . does little if anything . . . to demonstrate . . . secondary meaning," *Tenneco Auto. Operating Co., Inc. v. Kingdom Auto Parts*, 410 F. App'x 841, 852 (6th Cir. 2010), the district court appears to have discounted it: After acknowledging that we have held that $2 million in sales volume was insufficient to establish secondary meaning, *see Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 596 (6th Cir. 1989), the district court somehow concluded that Premium's sales of seven million units for $3 million *is* "sufficient to establish secondary meaning." The court's conclusion here is inexplicable.

The district court then considered the sixth factor, "established place in the market," and stated: "PBA has considered its establishment in the market together with the fifth factor—the

17

amount of sales and number of customers.  Therefore, this factor weighs slightly in Plaintiff PBA's favor."  It is unclear what it means for Premium to have "considered its establishment in the market," but regardless, the observation does not appear to be a basis for drawing any inference of an association between Premium's star-shaped Heavy Weight product-design trade dress and the product's source.

Finally, the district court held that "CBM [Creative] successfully rebuts the presumption of copying by claiming that it makes little sense for CBM to design an entirely new weight when its existing and already licensed eight gram star weight could be made more massive by increasing the thickness . . . ."  As we have explained: "The Supreme Court has stated that product-design trade dress can never be inherently distinctive.  Therefore, secondary meaning for any product design trade dress can not [*sic*] be inherent through evidence of copying."  *Gen. Motors Corp.*, 468 F.3d at 419 (citations and quotation marks omitted).  Although we are not convinced that Creative did not copy Premium's weight, whether it did so is irrelevant, because the question is whether it did so with the "intent to capitalize on" Premium's reputation or goodwill.  *See Abercrombie*, 280 F.3d at 628.  There is no evidence to that effect.

In summary, Premium did not adduce evidence from which a reasonable jury could conclude that customers associated the Premium brand—or any brand—with the "overall appearance" of the star-shaped Heavy Weight.  Accordingly, Premium acquired no protectable rights in its trade dress, and the district court's finding to the contrary is reversed.  In particular, we reverse the district court's grant of summary judgment to Premium on its trade-dress-infringement claim and order that judgment on that claim be entered in favor of Creative.

**III – Appeal and Cross-Appeal (Nos. 13-4049 and 13-4130)**

In the above-numbered appeal and cross-appeal, Premium argues that it was entitled to damages for price erosion, and Creative argues that the district court erred in admitting certain evidence of damages, failing to predicate its damages award on a finding that Creative had acted willfully, and awarding attorney's fees to Premium on Creative's patent- and trade-dress-infringement claims. Because we hold that Creative is not liable for infringement, all issues but the last are moot. We turn to the question whether the district court's attorney-fee award was error.

Under the Patent Act's fee-shifting provision, 35 U.S.C. § 285, a court may award reasonable attorney fees to the prevailing party in "exceptional" cases. As the Supreme Court recently explained, "an 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014). "District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Ibid.* The federal courts of appeals are to "apply an abuse-of-discretion standard in reviewing all aspects of a district court's § 285 determination." *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 134 S. Ct. 1744, 1749 (2014).

The district court concluded that Creative's infringement claim was exceptionally baseless. It based its conclusion on findings of fact including: that Premium had been selling its balloon-sealing device for nearly ten years prior to Creative's 1993 patent application, that Premium's balloon-sealing device appeared in a catalog in 1989, that the two products looked virtually identical, and that the instruction sheet for Creative's product "mimics the instructions

19

in the catalog for PBA's product." The court also refused to credit the claim of the inventor of Creative's balloon-sealing device that he drew the design "at his kitchen table," implicitly from scratch. The court concluded: "It is difficult to accept that someone actively employed in the balloon accessory industry would have never seen a balloon sealing device prior to drawing one at his kitchen table that is substantially identical to another balloon sealing device already on the market." On the other hand, the court also noted that there was no evidence that Creative had acted improperly in obtaining its patent in the first place, notwithstanding the existence of Premium's so-called "prior art": "[Premium] has not advanced clear and convincing evidence of intent to deceive or even alleged that CBM had the requisite intent to deceive."

The fact that Premium had a valid defense to Creative's patent-infringement claim does not render that claim frivolous *ab initio*. Indeed, defenses to infringement based on prior commercial use are quite common, s*ee* 35 U.S.C. § 273, and were a court to award attorney's fees whenever such a defense is validly asserted, fee awards would be commonplace rather than "exceptional." Although the court was skeptical of the testimony of the "inventor" of Creative's balloon-sealing device, it was similarly skeptical that Creative had acted in bad faith before the patent office. If bad faith was absent at the time of Creative's patent application, one cannot presume that it was present at the time that Creative filed its lawsuit, particularly since, by then, Creative had an apparently valid patent in hand. There is little indication that Creative believed that its infringement claims lacked merit. And when Creative's lawyers became aware of Premium's prior commercial use, they voluntarily dismissed the infringement claims. In view of the foregoing, the district court's attorney-fee award was improper.

The district court also awarded attorney fees to Premium on Creative's trade-dress infringement claim—that Premium infringed Creative's trade-dress rights in its balloon-sealing

device. The court did so pursuant to 15 U.S.C. § 1117(a), which allows the district court to award reasonable attorney's fees to the prevailing party in actions for, inter alia, trade-dress infringement. The basis for the court's award under § 1117(a) was the same as that for its award under 35 U.S.C. § 285.

"In applying 15 U.S.C. § 1117(a) to a prevailing defendant, this Court has held that an 'exceptional' case is one where a plaintiff brings a suit that could fairly be described as 'oppressive.'" *Eagles, Ltd. v. Am. Eagle Found.*, 356 F.3d 724, 728 (6th Cir. 2004) (citations and certain quotation marks omitted). "Awarding attorney's fees to a prevailing defendant is meant to provide protection against unfounded suits brought by trademark owners for harassment and the like." *Ibid.* (citations and quotation marks omitted). "The test requires an objective inquiry into whether the suit was unfounded when it was brought and a subjective inquiry into the plaintiff's conduct during litigation." *Ibid.*

As with 35 U.S.C. § 285, we review an attorney-fee award under § 1117(a) for abuse of discretion. Again, although Creative's claims lacked merit, there is little indication that Creative was aware of that fact at the time that it filed suit, and when it became so aware, it voluntarily dismissed its infringement claims. Accordingly, there is no basis for concluding that the suit was initiated for purposes of harassment.

The district court's decision to award Premium attorney's fees on Creative's trade-dress-infringement claim is therefore reversed.