NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0195n.06

No. 19-3533

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| HEALTH AND WELLNESS LIFESTYLE CLUBS, LLC, | ) ) ) | **FILED** Apr 06, 2020 DEBORAH S. HUNT, Clerk |
| Plaintiff - Appellant, | ) ) |  |
| v. | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| RAINTREE GOLF, LLC and JOHN RAINIERI, | ) ) ) |  |
| Defendants - Appellees. | ) |  |

BEFORE: SILER, GIBBONS, and READLER, Circuit Judges.

JULIA SMITH GIBBONS, Circuit Judge. Health and Wellness Lifestyle Clubs, LLC ("H&W") brings this breach of contract action against Raintree Golf, LLC and its owner John Rainieri (collectively, "Raintree"). H&W entered into an agreement with Raintree for the planned purchase of Prestwick Country Club ("Prestwick"). Despite nearly closing the sale on several occasions, the parties ultimately failed to complete the transaction before their agreed-upon deadline. H&W argues that Raintree breached the purchase agreement by withholding and misrepresenting adverse information about Prestwick's financial health. The district court disagreed and granted summary judgment to Raintree. H&W now appeals. Because the disclosure of complete and accurate financial information was a condition precedent to H&W's duty to perform under the contract—not a stand-alone promise by Raintree—the non-occurrence of that

condition was not a breach. And even if it was a breach, the breach did not cause the deal to fail, as required by the contract's right-to-sue clause. We therefore affirm.

I.

In August 2015, H&W entered into an agreement for the planned purchase of Prestwick ("Prestwick Agreement").[1] The Prestwick Agreement provided that the parties would complete their transaction by the end of an approximately three-month closing period. During that period, the parties resolved to, among other things, conduct due diligence and procure the financing necessary to complete the transaction.

The closing period was structured to provide each party with ample opportunity to abort the transaction with little or no penalty. H&W was only required to perform under the contract if it could secure "third party financing" and if, "in its sole and absolute discretion," it was satisfied with the production and substance of Prestwick's business and financial records. DE 43-2, Prestwick Agreement, Page ID 1055–57. Raintree would even refund H&W's deposit if H&W was not satisfied with the disclosures. Similarly, the agreement only required Raintree to sell Prestwick if H&W "obtain[ed] and deliver[ed] to [Raintree] a written unconditional commitment" for "third party financing," as well as "the release of such funds into Escrow." *Id.* at 1056–57.

At the end of the closing period, H&W had yet to complete its due diligence or secure unconditional third-party financing; as a result, the agreement lapsed without consummation of the transaction. The parties nevertheless agreed to extend the closing period. They did so a total of three times. The last of these extensions expired on May 31, 2017, still without a completed deal.

---

[1] The parties also entered into a virtually identical agreement for the planned purchase of Raintree Country Club ("Raintree Agreement"). That transaction, which was conditioned on completion of the Prestwick transaction, also failed to close. Although the parties vigorously dispute aspects of this second transaction—namely, whether extensions to the closing deadline for the Prestwick Agreement applied equally to the Raintree Agreement—H&W's only contractual claim is for breach of the Prestwick Agreement. Still, even if H&W had alleged a breach of the Raintree Agreement, its claim would fail for the same reasons as those outlined in our analysis of the Prestwick Agreement.

H&W contends that, shortly after the final extension lapsed, it discovered several adverse facts about Prestwick's financial health. These included: (1) significantly lower than previously reported income; (2) a steep drop in event bookings over the previous ten months; and (3) Raintree's default on a loan used to finance its own acquisition of the property. All of these facts, according to H&W, were withheld or misrepresented by Raintree during the life of the Prestwick Agreement.

H&W filed suit on October 17, 2017, alleging that Raintree breached the Prestwick Agreement by withholding and misrepresenting adverse information about Prestwick's financial health.[2] These misrepresentations and omissions, it maintains, violated Raintree's stand-alone promises to provide complete and accurate financial information. After more than a year of fruitless settlement discussions, Raintree moved for summary judgment. H&W opposed the motion, arguing in relevant part that there remained a genuine dispute of fact as to whether Raintree had misrepresented Prestwick's financial health. It also moved, in the alternative, for further discovery pursuant to Fed. R. Civ. P. 56(d).

The district court granted summary judgment to Raintree and denied as moot H&W's motion for further discovery. In granting Raintree's motion for summary judgment, the district court reasoned that Raintree could not have breached the Prestwick Agreement because it had no duty to sell Prestwick unless H&W first obtained unconditional financing. It also found that H&W's claim was barred by Section 5.3 of the contract, which provides that no breach of "any representation or warranty" is actionable if the underlying information was known to H&W "prior to Closing." Shortly thereafter, H&W moved for the district court to issue a scheduling order, but

---

[2] H&W also brought claims for negligence, misrepresentation, fraudulent concealment, fraudulent inducement, and common law fraud and deceit. The parties stipulated to dismissal of those claims shortly after the district court entered summary judgment on H&W's breach of contract claim. Only the breach of contract claim is at issue on appeal.

the parties stipulated to dismissal of the remaining claims before the court could resolve the motion. H&W timely appealed.

II.

We review *de novo* a district court's grant of summary judgment, *Doe v. City of Memphis*, 928 F.3d 481, 486 (6th Cir. 2019), and "may affirm on any grounds supported by the record[,] even if different from the reasons of the district court," *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 629 (6th Cir. 2002). Summary judgment is proper only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, we view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in her favor. *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 895 (6th Cir. 2004).

III.

H&W argues that the district court erred in three ways. First, H&W argues that the district court erred in granting summary judgment to Raintree because there remain several disputes of material fact. Second, H&W argues that the district court abused its discretion in denying its Fed. R. Civ. P. 56(d) motion for further discovery. Finally, H&W argues that the district court erred in failing to issue a formal scheduling order as required by Fed. R. Civ. P. 16(b). We address each issue in turn.

A.

H&W first argues that the district court erred in granting summary judgment to Raintree. In doing so, H&W maintains that Raintree, separate from its promise to sell Prestwick, made an enforceable promise to provide H&W with complete and accurate financial information about Prestwick. That promise, H&W contends, imposed an additional obligation on Raintree that was

independent of the parties' underlying real estate transaction.  H&W thus argues that summary judgment was unwarranted because there remain genuine disputes of fact as to whether Raintree— separate from any promise to sell Prestwick—misrepresented the club's financial health.

1.

As an initial matter, we note that the district court misconstrued H&W's claim.  The district court held that Raintree could not have breached the Prestwick Agreement because it was under no obligation to sell Prestwick once H&W failed to obtain unconditional financing.  But H&W's claim is unrelated to Raintree's obligation to sell Prestwick; instead, H&W argues that, regardless of whether Raintree had an obligation to sell Prestwick, Raintree breached a stand-alone promise to provide H&W with complete and accurate financial information.  Similarly, the district court's reliance on Section 5.3 was misplaced.  As we describe below, Section 5.3 only governs claims for misrepresentations discovered *after* the closing period—that is, if the deal closed.  But the parties never closed their transaction.

We may, nevertheless, affirm the district court based on any reason supported by the record.  *Abercrombie*, 280 F.3d at 629.  Here, the fatal flaw in H&W's claim is that it never bargained for a stand-alone promise to receive complete and accurate financial information; rather, H&W bargained to receive such information as a condition of its own performance under the Prestwick Agreement.  Delaware law distinguishes between promises and conditions.[3] *See Summit*

---

[3] Although H&W filed suit in Ohio, it is a Delaware corporation, and the Prestwick Agreement contains a Delaware choice-of-law provision.  Under Ohio law, a choice-of-law provision is binding on the parties unless (1) "there is no other reasonable basis for the parties' choice," or (2) application of the chosen law would violate a "fundamental policy" of the state which (a) has a "materially greater interest . . . in the determination of the particular issue," and (b) is the state whose law would apply in the "absence of an effective choice of law by the parties." *Wise v. Zwicker & Assocs., P.C.*, 780 F.3d 710, 715 (6th Cir. 2015) (quoting Restatement (Second) of Conflict of Laws § 187(2) (Am. Law Inst. 1971)); *Sekeres v. Arbaugh*, 508 N.E.2d 941, 942 (Ohio 1987); *see also Tele-Save Merch. Co. v. Consumers Distrib. Co.*, 814 F.2d 1120, 1122 (6th Cir. 1987) ("Ohio choice-of-law principles strongly favor upholding the chosen law of the contracting parties.").  Here, neither party argues that Ohio law should apply, and no discernable conflict exists between the applicable laws of Ohio and Delaware such that applying Delaware law would jeopardize a "fundamental policy" of Ohio.  We therefore give effect to the parties' agreement and apply Delaware law.

*Inv'rs II, L.P. v. Sechrist Indus., Inc.*, No. Civ.A. 19400, 2002 WL 31260989, at \*7 (Del. Ch. Sep. 20, 2002). While a promise "give[s] rise to a duty to perform," a condition is an act or event that "must occur before a party is obligated to perform." *TravelCenters of Am. LLC v. Brog*, Civil Action No. 3751-CC, 2008 WL 5272861, at \*3 (Del. Ch. Dec. 5, 2008) (citing Restatement (Second) of Contracts § 224 (Am. Law Inst. 1981)). As relevant here, "the non-performance of a promise . . . can result in a breach of contract," but "the non-occurrence of a condition is not considered a breach unless the party promised that the condition would occur." *Id.*

Under Article IV of the Prestwick Agreement, Raintree's provision of complete and accurate financial information was a condition precedent to H&W's performance, not a stand-alone promise. Section 4.1(b), which expressly outlines the "[g]eneral conditions precedent to closing of Escrow," provides that "all" of H&W's obligations are "subject to [H&W] determining in its sole and absolute discretion that all of the conditions set forth in this [section] have been satisfied or waived in writing." DE 43-2, Prestwick Agreement, Page ID 1055–56. The same section then proceeds to describe those "conditions" which must be satisfied before H&W is "obligat[ed]" to perform under the contract. *Id.* at 1055. Notably, the "conditions" include Raintree providing H&W with (1) unfettered access to Prestwick's business and property records, (2) a description of "any material adverse condition," (3) "accurate" financial statements, and (4) "true and correct" representations and warranties.[4] *Id.* at 1056, 1059–64.

Section 4.7 is equally unambiguous in its characterization of the same acts and events as conditions rather than promises. That section, helpfully titled "Conditions Precedent to Obligation of Purchaser," likewise provides that "the obligation of [H&W] to consummate the transaction[] . . . shall be subject to the fulfillment on or before the date of Closing of all of the following

---

[4] The specific representations and warranties, including those relating to Raintree's financial statements and records, are outlined in Section 5.1 of the Prestwick Agreement.

conditions." *Id.* at 1079. It then goes on to again define those "conditions" as, among other acts and events, Raintree providing H&W with (1) "all of the items required to be delivered pursuant to the terms of this Agreement," and (2) "true and correct" representations and warranties. *Id.* Thus, as the plain and unambiguous language of Sections 4.1 and 4.7 makes clear, the parties intended the omissions and misrepresentations complained of by H&W to be "conditions" of H&W's performance under the Prestwick Agreement, not enforceable promises. *Id.* at 1055, 1079; *see also Brog*, 2008 WL 5272861, at \*3, \*3 n.21 (holding that the use of mandatory words like "must" and shall" to define how a condition is satisfied does not create a "promise").

Indeed, the parties expressly agreed in Section 6.2 that, "[i]n the event the [planned] sale . . . *is not consummated*," H&W would not sue Raintree for "failure to satisfy a closing condition." DE 43-2, Prestwick Agreement, Page ID 1094 (emphasis added). As repeated throughout the contract, the remedy for non-occurrence of such conditions is for H&W to "terminate" the agreement and escape any obligations or liability under the same. *Id.* at 1053–54, 1056, 1059, 1064. That remedy stands in stark contrast to the one provided in Section 5.3 of the contract for misrepresentations discovered *after* the deal closed. In such a situation, H&W would expect to receive the country club described to it, and the parties agreed that, if H&W did not, it could bring suit to recoup the expected benefit of its bargain. That makes sense: H&W "did not bargain to receive [Prestwick's financial information] as an end in itself"—rather, it bargained for such information as a means to help facilitate the desired transaction and protect itself from having to perform absent certain assurances. *Summit Inv'rs II*, 2002 WL 31260989, at \*7.

H&W nevertheless suggests that we should disregard the above provisions and read Section 9.1 as authorizing suit based on the same conduct detailed throughout Articles IV and V. Section 9.1, which is housed in an article purporting to govern "Disclaimers and Waivers," states

in language virtually identical to Sections 4.1, 4.7, and 5.1 that Raintree "warrants" that its "financial statements" and other records "reflect the true and accurate position of the business . . . and that no known material adverse condition exits [sic] that would affect the financing of the transaction . . . [or] adversely impact the business operations." DE 43-2, Prestwick Agreement, Page ID 1099. As raised for the first time at oral argument, H&W contends that the statement in Section 9.1 should override the more specific provisions in Articles IV and V because of the so-called survival clause in Section 9.3. That subsection, which is titled "Survival of Disclaimers," states that "[t]he provisions of this Article IX shall survive Closing or any termination of this Agreement." *Id.* at 1101. In turn, because the warranty in Section 9.1 is part of Article IX, H&W maintains that Section 9.3 must create an enforceable promise.

There are two problems with H&W's reading of Sections 9.1 and 9.3. First, Article IX would be a strange place to hide unique warranties when the Articles IV, V, and VI contain a specific and detailed scheme expressly governing the same assurances. As outlined above, Sections 4.1, 4.7, 5.3, and 6.2 work together to provide that Raintree's representations and warranties relating to its financial statements and records are unenforceable conditions precedent *unless* the parties' transaction is consummated. It would make little sense to include such a carefully drawn distinction between pre- and post-closing suits to enforce these warranties if the parties intended to abrogate that same scheme by implication in a boilerplate provision titled "Disclaimers and Waivers." *Id.* at 1099. In effect, H&W's proposed interpretation would allow a general, miscellaneous provision to control the more specific provisions of Articles IV, V, and VI—a result at odds with long-settled principles of contract interpretation in Delaware. *See DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005) (holding that, when contract terms conflict, more specific terms control over general terms).

Second, there is little evidence that the parties intended Section 9.3 to encompass warranties. Article IX, by its terms, was meant to govern "Disclaimers and Waivers." DE 43-2, Prestwick Agreement, Page ID 1099. Unlike the other provisions of Article IX, Section 9.1 is not a disclaimer or waiver but rather a warranty. Although Section 9.3 states that it applies to "[t]he provisions of . . . Article IX," the header for Section 9.3—separate from the general title of Article IX—suggests that it applies only to the "Survival of Disclaimers." *Id.* at 1101. Indeed, there is neither a reference to warranties in the body of Section 9.3 nor language reconciling the conflict H&W's interpretation would create with Articles IV, V, and VI. *See Schwan's Home Serv., Inc. v. Microwave Sci., JV, LLC*, C.A. No. N11C–11–008, 2013 WL 3350881, at *6 (Del. Super. Ct. June 24, 2013) (holding that "every part" of a contract "should be interpreted with reference to the whole" and "in a manner that makes [it] internally consistent"); *see also GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012) ("The meaning inferred from a particular provision cannot control the meaning of the entire agreement if such an inference conflicts with the agreement's overall scheme or plan."). Accordingly, regardless of whether Raintree misrepresented Prestwick's financial health, it did not breach the Prestwick Agreement.

2.

H&W's claim fails for a second reason. As it did in the district court, H&W argues that, because the parties' transaction never closed, Section 6.2 creates a right to sue and seek damages for any default by Raintree. Under that right-to-sue clause, however, H&W is only authorized to bring suit if the transaction failed "*due to* [Raintree's] default." DE 43-2, Prestwick Agreement, Page ID 1094 (emphasis added). Thus, even assuming that Raintree breached the Prestwick Agreement by hiding or misrepresenting Prestwick's financial health, the breach would only be actionable if it caused the transaction to fail. It did not.

As the district court found, the deal fell through because H&W was unable to secure unconditional third-party financing before the closing period expired—a condition precedent to Raintree's obligation to sell Prestwick. It is less likely—not more likely—that H&W would have satisfied this financing condition if lenders had known of Prestwick's true financial position.[5] Indeed, H&W continued to apply for financing up until Raintree moved for summary judgment and was still unable to secure a lender's "written unconditional commitment." *Id.* at 1056. Although H&W now claims that it could have self-financed the deal, nothing in the record shows that it provided Raintree with a "writing" to "evidence" this ability, as required by Section 4.1(b)(4). *Id.* at 1058. And the documents submitted by H&W do not reflect liquid assets exceeding the purchase price. Accordingly, because the transaction did not fail "due to" Raintree's conduct, any breach is not actionable.

B.

H&W next argues that the district court abused its discretion in denying H&W's motion for further discovery under Fed. R. Civ. P. 56(d). We disagree. A district court does not abuse its discretion when, as here, granting a party's request for additional discovery "would not have changed the ultimate result." *Plott v. Gen. Motors Corp.*, 71 F.3d 1190, 1197 (6th Cir. 1995); *see also* Fed. R. Civ. P. 56(b) (allowing parties to move for summary judgment "at any time" before the close of discovery). Specifically, no amount of discovery would have changed the Prestwick Agreement's plain and unambiguous language making Raintree's financial disclosures a condition precedent. *See United Rentals, Inc. v. RAM Holdings, Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007)

---

[5] We do not find, as the district court did, that H&W's claim necessarily fails because Raintree was excused from having to sell the property when H&W could not satisfy the financing condition. H&W does not contend that Raintree breached the Prestwick Agreement by refusing to *sell* the property; instead, it argues that Raintree breached the agreement by failing to perform other stand-alone promises contained in the agreement. Still, the district court's thorough analysis of the relation between the financing condition and why the parties' transaction was never completed remains instructive because of the causation requirement in the right-to-sue clause.

("[P]arol evidence cannot be used to manufacture an ambiguity in a contract that facially has only one reasonable meaning."). And, even if we agreed that Raintree's conduct broke a promise in the Prestwick Agreement, any evidence tending to show that financing was available to H&W—either before or after the disclosures—would be in H&W's possession, not Raintree's. Accordingly, the district court did not abuse its discretion in denying H&W's motion for further discovery.

## C.

Finally, H&W argues that the district court erred in failing to enter a scheduling order as required by Fed. R. Civ. P. 16(b). Under Fed. R. Civ. P. 16(b), a district court "must" enter a scheduling order "limit[ing] the time to join other parties, amend the pleadings, complete discovery, and file motions." H&W is right that the district court erred by failing to enter such an order. That error, however, is harmless. *See Rubin v. Jenkusky*, 601 F. App'x 606, 610–11 (10th Cir. 2015) (finding failure to issue scheduling order harmless error); *Muhammed v. Wadley Reg'l Med. Ctr. Found.*, No. 98-41216, 1999 WL 1068238, at *2 (5th Cir. Oct. 22, 1999) (same); 1 Steven Gensler, *Federal Rules of Civil Procedure, Rules and Commentary*, Rule 16 ("[A] judge's failure to issue a timely scheduling order does not deprive the judge of the power to take other actions, including merits dispositions.").

Specifically, H&W cites no case, and we can find none, holding that the failure to issue a scheduling order requires reversal of an otherwise justified award of summary judgment. Nor does H&W explain how it was prejudiced by the oversight. The district court still closely managed the litigation—it oversaw the exchange of initial disclosures under Fed. R. Civ. P. 26(a), held four case management conferences, and even prompted Raintree to move for summary judgment. *See* Fed. R. Civ. P. 16 Advisory Committee Note to 1983 Amendment ("Rule 16(b) assures that the judge will take some early control over the litigation . . . ."). Although H&W argues that the

absence of a scheduling order deprived it of any opportunity to conduct discovery, it was free to seek discovery at any point after the parties' initial discovery conference. *See* Fed. R. Civ. P. 26(d)(1). And, as discussed above, no amount of discovery would have changed the unambiguous language of the parties' contract. Accordingly, the district court's error was harmless.

IV.

Based on the foregoing, we affirm.